[Civ. No. 15068.   First Dist., Div. One.   Sept. 29, 1952.]

MICHAEL PECAROVICH, Respondent, v. THOMAS A. BECKER et al., Defendants; VIRGIL D. DARDI, Appellant.

Henry C. Clausen for Appellant.

Partridge & O'Connell for Respondent.

WOOD (Fred B.), J.—Defendant Virgil D. Dardi has appealed from a judgment for $10,500 in favor of plaintiff Michael Pecarovich, in an action for salary for the years 1944, 1945, and 1946, pursuant to a contract between Becker and Pecarovich whereby Becker, as owner of the San Francisco Clippers, a professional football team, employed Pecarovich as coach.

The principal questions upon this appeal are these: (1) Does the evidence support the finding that appellant assumed the obligations toward respondent which were created by the Becker-Pecarovich employment contract, and (2) If he did, does the evidence support the finding that appellant owes respondent $10,500 under that contract?

(1) The evidence supports the finding that appellant assumed the obligations of Becker toward respondent under the Becker-Pecarovich contract of September 26, 1944* He acquired from Becker a one-half interest in the San Francisco Clippers. This he did by agreement in writing executed with Becker on the 16th of October, 1944. In that agreement they recited, "Whereas, the party of the first part [Becker] is the owner of the franchise, issued by the American Professional Football League for the city and county of San Fran-

---

*The Becker-Pecarovich contract expressly gave Backer "the right to assign and transfer all or part of this contract and his obligations and rights hereunder in the event he shall sell his franchise or any part thereof."

cisco, and as a result thereof, organized and played a team, known and designated as 'The San Francisco Clippers'; and WHEREAS, Party of the second part [Dardi] is desirous of acquiring a fifty per cent interest in and to said franchise and said Ball Club,'' and mutually agreed ''1. That the said Party of the Second Part will pay to said Party of the First Part the sum of $10,000.00, receipt of which is hereby acknowledged, in payment of a fifty per cent interest in said franchise, club, equipment, contracts, players and all other assets of said Club; 2. That there are certain bills outstanding in the sum of $8130.00; that the sum of $7200.00 is a cash credit and therefore the said Party of the Second Part will contribute an equal sum, the difference between said sum of $8130.00 and the sum of $7200.00 to be paid by Party of the First Part; 3. It is further agreed that the management, control and operation of the team shall be in the hands and under the direction of Party of the Second Part and that at the end of the present playing season and upon the completion of the schedule, an accounting shall be made as between the parties and they shall divide the profits, share and share alike, and contribute in the same manner to the losses, if any. 4. This agreement may be terminated by the sale of the interest of one to the other and in the event the other does not choose to purchase the interest of the one, then it may be sold on the open market at a figure to be agreed upon by the parties. 5. The said Party of the Second Part shall keep true and correct books of account, which shall be open to the inspection of said Party of the First Part upon his request. 6. The parties shall divide the profits and settle up accounts at the end of each playing season.''

Here we find appellant saying that he desires to acquire a 50 per cent interest in the franchise and the ball club mentioned in the Becker-Pecarovich contract, the club plaintiff was employed to coach, and the franchise upon the sale of which, in whole or in part, Becker could transfer, in whole or in part, his rights and obligations under the Becker-Pecarovich contract. Next, in the October, 1944, agreement, appellant agrees that he will pay $10,000 for a ''fifty per cent interest in said franchise, club, equipment, contracts, players and all other assets of said Club.'' ''Contracts'' would seem quite clearly to include plaintiff's coaching contract. Were there any doubt, quite certainly it would be covered by the comprehensive phrase ''all other assets'' of the Club.

By the same agreement appellant became a full partner with Becker in this enterprise and acquired and assumed the "management, control and operation" of that enterprise. It is reasonable to conclude that by their October, 1944, agreement Becker and Dardi made themselves, jointly, the employer of Pecarovich under the Becker-Pecarovich agreement.

About October 10, 1944, Becker told respondent that appellant had bought a half interest in the team and would assume active management, would run the team. Respondent was then about to leave for Seattle and Portland for games to be played there. As soon as he returned to San Francisco, about October 17, respondent went to Dardi's place of business to see him. They discussed the team. Appellant, who had previously owned an Oakland team, said he was going to bring some of those players over and wanted respondent to absorb some of them in the Clippers. He told respondent he had not received a copy of the Becker-Pecarovich contract. That day respondent took his copy of that contract to appellant, who said he wanted to make a copy, kept it a couple of days and then returned it to respondent. Concerning any discussion they had upon the return of that contract, respondent said, "He didn't say very much, he just took it for granted. I said, 'I am going to coach?' and he said, 'Yes.' He said 'I let Mr. Brill, of Oakland, Marty Brill go, of Oakland.'" (Brill had coached appellant's Oakland team.) Asked if "Dardi told you he was going to retain you?" appellant replied, "Yes." Asked if he continued to coach the team, appellant said, "Yes, I coached the team, and I went down every day to see Mr. Dardi . . . and he had come out to all the practice and all the games, so we were very close during the entire year." Appellant told respondent he had bought an interest in the team, that he was the boss, was running everything, and that respondent should come to appellant for anything. The publicity releases which appellant gave out to the press in the fall of 1944 concerning the team and its activities featured respondent as coach of the Clippers. During 1944, after appellant took charge of the team, respondent received and cashed three checks drawn by Dowd, the general manager, against the team bank account: $1,000 by check dated November 5; $388.60, November 24; $1,000, December 6. Dowd testified that he took $4,500 as the basis, that being respondent's salary for 1944 as specified in the Becker-Pecarovich contract. He figured that Becker owed respondent for the five games that were played before appel-

lant bought in and that the new management became obligated for the remaining $3,000 for the eight games that were played after that date. However, Dowd said he never discussed with respondent the basis upon which he computed this division of salary; he simply drew the checks from time to time on instructions of appellant and never told respondent that he was paying respondent just for the games he coached after the date of the Becker-Dardi contract. The Becker-Pecarovich contract fixed the salary upon an annual basis, payable semimonthly, not upon a per game basis: $4,500 "for the first year," $5,500 "for the second year, and" $7,500 "for the third year of said employment, payable on the first and fifteenth days of each calendar month . . ." Since but three weeks, including two paydays, elapsed between the execution of the Becker-Pecarovich contract and the day that respondent and appellant had their first conversation, it was reasonable for the trial court to infer from the words and conduct of appellant and the conduct of his general manager that appellant assumed the obligations and acquired the rights of the employer under the Becker-Pecarovich contract, including the obligation to pay whatever portion of respondent's salary that had accrued at the time appellant acquired a half interest in the team and took over the management.

Yet, appellant contends that when he wrote the word "contracts" into that agreement he meant "players' contracts," not the coaching contract. That hardly seems plausible, especially when, as here, the writing expressly lists "players" as well as "contracts," as separate items in the list of assets: "Franchise, club, equipment, contracts, players and all other assets." In support of his contention, appellant tendered and was permitted to introduce evidence concerning the preliminary negotiations between Becker and appellant, held October 9, 1944, at the Biltmore Hotel, Los Angeles. Dowd and a Mr. Bowen were also present. Dowd testified that there was a discussion concerning the Pecarovich contract, that he knew from the discussion there was a contract "but at that time I never knew—we never discussed the terms of that contract, except the amount that was paid for the season, and Mr. Dardi, when this matter was brought up, told Mr. Becker and Bowen that he was not interested in Pecarovich's future or present contract, that he had Brill under contract, and as far as he was concerned Brill was going to be the coach." Dardi testified respecting

the same conversation, to the effect that he specifically told Becker he did not want the Pecarovich contract. But Becker, asked if Dardi ever told him that Dardi did not consider himself bound by the Pecarovich contract said "No. We never discussed it." Soon after October 9, the Becker-Dardi contract was drafted at San Francisco, and it appears that the attorney who drafted it had no record or recollection of any instruction or discussion concerning the Pecarovich contract. Thus, the evidence concerning the negotiations was in conflict, a conflict which the trial court resolved in favor of the respondent.

In addition, we have the fact that Becker had a contract for the use of Kezar Stadium. Dowd, who became general manager of this club a day or two after the execution of the Becker-Dardi contract, testified that the Kezar contract "was the main contract of the whole thing. In other words, that was the contract we wanted, the contract with the Stadium." So, according to appellant, "contracts" included players' contracts and the Kezar contract. It is difficult to see how that word could have been used to include those two quite different kinds of contracts and not also include the contract for respondent's services as coach.

Appellant erroneously claims that the court committed prejudicial error in excluding the testimony of Dowd concerning the conversation of October 9, 1944, between Dardi and Becker. It is true that when such a question was first asked of Dowd the witness was limited to saying whether or not there was a conversation on that subject, Becker having testified there was none. Dowd said there was. Soon thereafter, upon cross-examination, respondent asked what that conversation was and Dowd gave the testimony which we have already narrated. We consider that the error, if any, of the former exclusion was thus cured. The testimony did not later come in casually or incidentally. Respondent's counsel pointedly asked the question, indicating he wished the court to have the whole story, particularly in view of the conflict in the testimony of appellant and respondent. Shortly thereafter, upon redirect examination, appellant asked Dowd a number of questions but did not touch upon this subject, and we find nothing in the record to indicate that Dowd had any information additional to that which he gave in response to respondent's question.

The admission of parol evidence was proper. The parol evidence rule is not applicable to a controversy between

a party and a stranger to a writing, as to the meaning of that writing. Moreover, the language of this particular writing was susceptible to explanation by the use of extrinsic evidence concerning the intent of Dardi to assume or not to assume the obligations of the employer under the Becker-Pecarovich contract. ■ The evidence by conduct also shows that appellant received the benefits of the Becker-Pecarovich contract, the services of respondent in coaching the team. That brings into play section 1589 of the Civil Code: "A voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the obligations arising from it, so far as the facts are known, or ought to be known, to the person accepting." Section 3521 of the same code is of similar import: "He who takes the benefit must bear the burden." (See *Jegen* v. *Berger*, 77 Cal.App.2d 1 [174 P.2d 489], for a discussion of these several principles of law; and *Bergin* v. *van der Steen*, 107 Cal.App.2d 8, 18 [236 P.2d 613], and *Walmsley* v. *Holcomb*, 61 Cal.App.2d 578, 582 [143 P.2d 298], concerning the significance of sections 1589 and 3521 of the Civil Code.)

Appellant refers to certain remarks by the trial judge concerning the admissibility of parol evidence to explain the Becker-Dardi agreement, and suggests he may have disregarded that evidence. We draw no such inference. ■ Moreover, a judgment is "tested by the trial court's judicial action (not judicial comment), as recorded in the findings of fact and conclusions of law, viewed in the light of the evidence received." (*Slavich* v. *Slavich*, 108 Cal.App.2d 451, 455 [239 P.2d 100].)

■ Appellant directs attention to the fact that the Becker-Pecarovich contract was for a three-year period, and to section 1624 of the Civil Code which declares invalid an "agreement that by its terms is not to be performed within a year" unless "the same, or some note or memorandum thereof, is in writing and subscribed by the party to be charged." We consider the Becker-Dardi agreement of October, 1944, a sufficient memorandum of appellant's agreement to acquire rights and assume obligations under the Becker-Pecarovich contract. (*Walsh* v. *Standart*, 174 Cal. 807, 810 [164 P. 795], and *Dunham, Carrigan & Hayden Co.* v. *Rubber Co.*, 84 Cal. App. 669, 673-674 [258 P. 663].) Moreover, the statute cited does not apply because the coaching contract was not one which by its terms was not to be performed within a year from

its making. It gave the employer the "right to terminate this contract by giving the Employee written notice of his election . . . at least ninety . . . days prior to September 1st of any year and by paying to Employee the sum of Two thousand five hundred dollars if Employer cancels this contract for the second and third years of its term . . ." (See *Dutton D. Co.* v. *United States F.& G. Co.*, 136 Cal.App. 574, 579 [29 P.2d 316], and *Hollywood M. P. Equipment Co.* v. *Furer*, 16 Cal.2d 184, 186-188 [105 P.2d 299].)

Appellant invokes section 15017 of the Corporations Code: "A person admitted as a partner into an existing partnership is liable for all the obligations of the partnership arising before his admission as though he had been a partner when such obligations were incurred, except that this liability shall be satisfied only out of partnership property." He says this means that his liability, if any, toward respondent is limited to payment out of the partnership assets and that there are no such assets. If we may assume that section 15017 applies to the formation of a partnership where none existed before, as in this case, it did not prevent appellant from assuming existing obligations upon buying into a going business and becoming a partner. That is a matter of contract between the parties. As said of section 2411 of the Civil Code, of which section 15017 is but a continuation, this statute "does not determine the nature of any particular obligation, nor the time when it may be deemed to arise. It does not attempt, in other words, to interfere with the general rules of contract or property." (*Ellingson* v. *Walsh, O'Connor & Barneson*, 15 Cal.2d 673, 677 [104 P.2d 507].)

(2) The evidence does not support the finding that appellant owes respondent $10,500 under the Becker-Pecarovich contract. It would support a finding of $4,000.

The trial court found that appellant and Becker breached the contract on or about August 25, 1945, by failing to perform it according to its terms and by informing plaintiff they would not thereafter operate the San Francisco Clippers Football Team and did not intend thereafter to perform the contract, and by refusing to accept the services of respondent. The court further found that appellant and Becker omitted to exercise the right granted them by the contract to terminate the contract in 1945 or in 1946 "in the manner provided in" the contract.

Accordingly, the court computed the damages upon the basis of the full three-year period of the contract ($4,500 for

1944, $5,500 in 1945, and $7,500 for 1946) less $3,000 paid respondent under the contract and $4,000 earned elsewhere by him during that period and after his discharge. Upon that basis the court made a proper computation.*

The termination clause of respondent's contract read as follows: "EMPLOYER shall have the right to terminate this contract by giving EMPLOYEE written notice of his election, signed by EMPLOYER, at least ninety (90) days prior to September 1st of any year and by paying to EMPLOYEE the sum of Two Thousand Five Hundred Dollars ($2,500.00) if EMPLOYER cancels this contract for the second and third years of its term, or the sum of One Thousand Five Hundred Dollars ($1,500.00) if EMPLOYER cancells [sic] this contract for the third year only."

The trial court erred in the application of this termination clause. ■ We have found no California decisions in point but judicial decisions in other jurisdictions indicate that if a person refuses to perform a contract which is terminable by him upon certain conditions, the amount of money he would have to pay in exercising his election to terminate becomes the measure of damages for his breach. It was so held in *French v. Brookes* (1830), 6 Bing. 354, S.C. 4 Moo.&P., 11, 130 Eng. Rep. 1316. The defendant employed plaintiff to superintend mines in America for three years, with a proviso that plaintiff should not be dismissed without twelve months' notice or payment of twelve months' salary and the reasonable expense of his return; if he stayed at the mines three years a reasonable sum would be allowed for the expense of the return of his family. During the three-year period, defendant dismissed plaintiff without giving the required notice or making the required payment. The jury awarded damages measured by twelve months' salary and a reasonable sum for the expense of plaintiff's return. This, the court held proper. It put the plaintiff "in the same situation as if the directors upon dismissing him, had paid at the same time twelve months' salary, and a reasonable sum toward defraying his expenses from South America to England." (P. 1319 of 130 Eng.Rep.) The court overruled plaintiff's contention that the contract,

---

*The court properly excluded from the amount of other earnings deductible, compensation received for services which respondent could have rendered if his employment with appellant had continued. *(Nuckolls v. College of Physicians & Surgeons,* 7 Cal.App. 233 [94 P. 81]. See, also, *Wendt v. Smith,* 50 Cal.App. 233, 237-238 [194 P. 736]; *Sanders v. Schenley Products Co.,* 108 F.2d 23, 25; and 15 A.L.R. 751, 769.)

"not having been determined in the mode pointed out by this agreement, it must be considered as subsisting in the mode originally contemplated" (p. 1319). Of like import are *East Anglican Railways Co.* v. *Lythgoe* (1851), 20 L.J.C.P. 84, 138 Eng.Rep. 287 (three months' notice or payment of three months' salary); *Derry* v. *Board of Education* (1894), 102 Mich. 631 [61 N.W. 61] (a provision for one week's notice called for damages in the amount of one week's pay); *Louisiana Oil Corp.* v. *Bryan* (1933), 165 Miss. 157 [147 So. 324], (a provision for a 10-day notice operated to limit the damages to 10 days' pay); *Tousley* v. *Atlantic City Ambassador Hotel Corp.* (1947), 25 N.J.Misc. 88 [50 A.2d 472, 475]; *Watson* v. *Russell* (1896), 149 N.Y. 388 [44 N.E. 161] (a termination clause requiring one week's notice and payment of one week's salary measured damages at two weeks of pay); *Bitterman* v. *Gluck,* 256 App.Div. 336 [9 N.Y.S.2d 1007] (a 30-day notice clause limited damages to 30 days' pay); *Freiburger* v. *Texas Co.* (1934), 216 Wis. 546 [257 N.W. 592] (damages limited to the notice period).

Although appellant's breach (August 25, 1945) did not occur 90 days prior to September 1st, as required for a notice of termination, it did occur prior to the commencement (September 1st) of the 1945 football season, and operated to deprive respondent of his last two years of service. By subscribing to the termination clause, respondent in effect put a value of $2,500 upon the last two-year period of the contract. That sum, upon the authority of the cases we have cited, furnishes the measure of his damages.

Accordingly, respondent's damages are measured by the rate of salary for the first year, $4,500, less the $3,000 paid him, plus the $2,500 under discussion. The resultant sum of $4,000 is not subject to deduction for any of the $4,000 earned elsewhere, for those moneys were earned after the expiration of the first year.

The judgment is reversed with directions to the trial court to amend its findings of fact and conclusions of law in accordance with this decision and render judgment on the findings and conclusions as revised. Each party will bear his own costs upon this appeal.

Peters, P. J., and Bray, J., concurred.