[Civ. No. 17279. First Dist., Div. Two. Oct. 22, 1957.]

## C. A. LEAVITT, Appellant, v. A. C. FREEMAN, Respondent.

Taft, Wright & Hopkins for Appellant.

Wagstaffe, Daba & Hulse for Respondent.

THE COURT.—This is an appeal from the amount of judgment awarded in an action based on a contract of employment. The case was heard in the Superior Court of San

Mateo County. Judgment in the amount of $1,200 was awarded to C. A. Leavitt, plaintiff and appellant. Appellant appeals from this award on the following grounds:

(1) The finding by the trial court reciting that plaintiff was "entitled to receive three months salary from the defendant at the rate of $400.00 per month, a total sum of $1,200.00 as of November 1, 1954," is not sustained by the evidence.

(2) The finding that plaintiff was not entitled to the sum of $9,600 for base salary for the period October, 1954 to September, 1956, inclusive, is not sustained by the evidence.

(3) By reason of the foregoing the findings of the trial court should be modified and appellant should recover $9,600.

The complaint is based on a written contract of employment entered into on October 1, 1953, by Leavitt and Freeman by which Leavitt was to work as foreman on Freeman's Goose Valley Ranch for a term of three years. In particular the action is based on provision 4 and 4(f) of said contract. This provision reads as follows:

"4. *Compensation.* Freeman agrees to pay Levitt [sic] a salary of $400.00 per month commencing October 1, 1953, payable at the end of each calendar month. In addition to said salary, Levitt shall receive a bonus as follows:

". . . . . . . . . . . .

"(f) If Freeman sells or disposes of his interest in the ranch, this agreement shall terminate as of date of sale, but Levitt shall be paid his 20% bonus for the period up to said date, plus his base salary to September 30, 1956."

Respondent had known appellant since 1925 and had previously employed him as a cow buyer and as a foreman. He asked his advice in connection with the purchase of Goose Valley Ranch. The ranch, consisting of 6,000 acres, was purchased in 1953.

Appellant began working on the ranch in October, 1953. The ranch was not successful and as no profits were made during its year of operation no question is present as to appellant's right to 20 per cent of the net profits.

Respondent testified that in August of 1954 he told appellant that some one had asked about the possibility of buying Goose Valley and that appellant replied, "If you can get a price I think we ought to sell it." The conversation, according to Freeman, continued in part as follows:

"A. I told Mr. Leavitt that I received a postal card, I be-

lieve, or a letter. I don't remember exactly what it was, but from Mr. Bryant that Mr. Bryant is inquiring or has an inquiry about the Goose Valley Ranch and what he thinks of me selling it.

"He says, 'If you can get a price I think we ought to sell it.'

"I says, 'How much of a price should I ask?'

"He says, 'If you can get around $400,000.00, or even 350.'

"Then I says, 'All right, I will ask that. If I do, then what is going to become of the contract that you got; that contract is for three years with me and this is only my first year of operation?'

"He says, 'Well, you don't have to own any ranch or any land, because the most successful cattlemen don't own any ranches, don't own any land, so we can go about leasing land and go on operating as a ranch—as an operation of cattle raising.'

"So I says, 'If that is the way you want to do it, I will go along that way.'

.   .   .   .   .   .   .   .   .   .   .   .

"Q. So far as the Arbuckle Ranch is concerned, when that particular exchange was proposed, did you have any discussion with your foreman, Mr. Leavitt? A. And I came back to Goose Valley and told Mr. Leavitt, so far as we were talking about 350 thousand or 400 thousand, that there is no deal for cash money at all, the only deal that I could make if we wanted to get rid of Goose Valley is to take an exchange of a 315 acre ranch in Arbuckle, and if he thinks this is good advice and we wanted to continue with our operation and our agreement, for him to go down to Arbuckle and look it over, and I told him whether he wants to continue with us and continue on those bases.

.   .   .   .   .   .   .   .   .   .   .

"Q. What was the rest of this discussion that Mr. Leavitt reported on his opinion on the exchange? A. Well, the next discussion was, we were to go ahead, and I am to go ahead and try to make this exchange with Mr. Welsh, which I did.

"Q. Was there any discussion at that time, as to whether Mr. Leavitt was to continue in your employ at Arbuckle on the ranch down there, if that would be successful? A. That was understood and agreed.

"Q. After that did you make the exchange? A. I did make the exchange after that.

.   .   .   .   .   .   .   .   .   .   .   .

"Q. Following the exchange of equity for equity in these

ranches, what happened then, so far as the physical operation at Goose Valley is concerned, and the physical operation at Arbuckle? A. Mr. Welsh wanted to take the ranch over the 1st of November and he was to give me the ranch the 1st of December, . . .

.  .  .  .  .  .  .  .  .  .  .  .  .  .

"Q. Thereafter did you actually take the cattle or some cattle that were at Goose Valley down to the Arbuckle Ranch? A. No, no; I sold that cattle, on the advice of Mr. Leavitt; that we could go out and buy cattle a little later and we wouldn't be bothered with a lot of feed and we could save on the feed and buy these cattle later and they will be a little lower in flesh and we wouldn't have to pay for the flesh that they are going to lose anyway during the time when feed is rather short.

.  .  .  .  .  .  .  .  .  .  .  .  .  .

"Q. I am going to ask you this question: If Mr. Leavitt had been unfavorable toward the Arbuckle exchange, would you have made the exchange? A. No, I wouldn't.

.  .  .  .  .  .  .  .  .  .  .  .  .  .

"Q. By the way, calling your attention back to the end of September, 1954, did Mr. Leavitt disappear about that time? A. Sure. I sold the cattle and then we shipped them, and Mr. Leavitt was going to move, he didn't tell me exactly, he intimated he might move, and when we got around to it, I couldn't take possession of the Welsh ranch until December 1st, and that was October, and we had two months to look around and do a lot of things that was necessary to do to prepare for the necessary operation.

.  .  .  .  .  .  .  .  .  .  .  .  .  .

". . . By that time it was the latter part of October. He came over and I says, 'Glen, here is the statement,' and he took it and never looked at it, shoved it in his pocket and he says, 'Well, I got a better set-up with Lewis & McDermott and I am not going with you.' "

On December 8, 1954, Freeman wrote to Leavitt that his employment agreement was still in full force and effect and if plaintiff did not resume his duties by December 15, 1954, the refusal thereof would constitute a repudiation of the contract.

Appellant testified that he received his last paycheck on October 1, 1954, which was for the month of September, and that he left the Goose Valley Ranch that day. He stated that

he began working for his present employer on a commission basis in November, 1954 and on a salary basis in December of the same year, and that his present salary is $600 per month. On cross-examination he stated that he had not known that the land had been exchanged but rather that he had been told it had been sold. He later testified that he had discussed the possibility of an exchange with respondent but that he had not recommended one. He did state that he had driven by the ranch at Arbuckle but only because he was curious and that he made the trip after the exchange took place.

Appellant further testified that he was not offered employment on the Arbuckle Ranch until he received a letter about December 15, 1954, asking him to return to work.

No question has been raised as to the validity of the employment contract. Appellant has asserted that provision 4(f) of that contract is valid and that the court was obliged to follow it in determining the measure of damages to be awarded. Under the terms of that provision, the court could only award one sum, $9,600, as its judgment. It is contended that Civil Code, section 3302, is controlling in this instance. That section reads as follows:

"*Breach of contract to pay liquidated sum.* The detriment caused by the breach of an obligation to pay money only, is deemed to be the amount due by the terms of the obligation, with interest thereon."

Appellant has cited *Pecarovich* v. *Becker,* 113 Cal.App.2d 309 [248 P.2d 123], in support of his contention.

Appellant argues that it is impossible to discover from the findings of the trial court the theory used to determine the amount of the judgment. It is appellant's belief that the trial court erroneously confused the condition as a promise and then attempted to apply either a rule voiding the payment provision as a penalty or one of mitigation of damages. He states that no attempt was made or could have been made to argue the case on either of these theories. Appellant's belief is without support in the record.

Respondent argues that appellant's contention that the court attempted to apply either a rule voiding the payment promise as a penalty or one of mitigation is based on a false premise and is purely conjectural. It is claimed that the finding is supported by sufficient evidence. He states that the court determined:

(1) That the employment contract continued in effect after the suspension of the Goose Valley operation and until Decem-

ber 15, 1954, when appellant refused to return to work. Respondent made a demand for his return in a letter dated December 8, 1954.

(2) That the appellant is estopped from asserting any right to damages because of his encouraging and agreeing with respondent as to the removal of his cattle-raising operations from Goose Valley to Arbuckle and by his agreement to act as foreman under the existing contract. The respondent relies upon his testimony hereinbefore quoted at length which testimony, if believed and accepted by the trial court, is sufficient to support an estoppel. ▮▮▮ The necessary elements of an equitable estoppel are set forth in Restatement of Contract, . section 90, as follows:

· "A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise."

▮▮▮ The facts relied upon by respondent to constitute an estoppel were specifically alleged as "a second separate and special defense" in respondent's answer. The trial court found that all the allegations of this defense are untrue. It also found that appellant did not refuse to return to work. Thus the findings negative each of the defenses relied upon by respondent, as pointed out above. But the court also found that appellant was entitled to recover but three months salary at the rate of $400 per month. This finding is wholly inconsistent with the findings which are adverse to respondent's special defenses. In the absence of a finding that either special defense is established, the recovery must be $9,600. If the recovery is to be but $1,200, one of the special defenses must have been found true. This conflict is irreconcilable, and requires reversal. (*Andrews* v. *Cunningham*, 105 Cal.App.2d 525 [233 P.2d 563]; *Maheras* v. *Bennett*, 81 Cal.App.2d 129 [182 P.2d 599].) Upon the record before us, we cannot resolve the conflict. In view of the admitted fact that the findings were drawn by appellant, who deems himself the aggrieved party, it may be that the trial court can resolve the conflict without the taking of further evidence.

Judgment reversed, with directions to the trial court to amend and clarify its findings, with or without the taking of further evidence, as that court may deem proper, and to enter judgment accordingly.