[No. F007927. Fifth Dist. Aug. 11, 1988.]

T. L. MARTIN, Plaintiff and Appellant, v.
U-HAUL COMPANY OF FRESNO, Defendant and Appellant.

[Opinion certified for partial publication.*]

* Pursuant to California Rules of Court, rule 976(b), this opinion is certified for publication with the exception of parts III through IV.

## COUNSEL

Moorad, Clark & Gleason and Sean F. Gleason for Plaintiff and Appellant.

Severson, Werson, Berke & Melchior, Jan T. Chilton and Kurt W. Melchior for Defendant and Appellant.

## OPINION

**BEST, Acting P. J.**—Plaintiff, T. L. Martin (Martin), appeals from a judgment of nonsuit in favor of the defendant, U-Haul Company of Fresno (U-Haul), on two causes of action and from a conditional order granting new trial on the third cause of action on which Martin was successful at trial. We reject Martin's contentions on appeal and affirm in all respects.

### STATEMENT OF THE CASE

Jury trial began on June 9, 1986, in Martin's action arising out of U-Haul's termination of a dealership contract. At the close of Martin's case, the court granted U-Haul's motions for nonsuit as to the first cause of action for fraud and the second cause of action for breach of the covenant of good faith and fair dealing. The jury returned a verdict in favor of the plaintiff for $29,000 on the remaining breach of contract cause of action. Martin was also awarded costs in the amount of $3,216.54, attorney fees in the amount of $16,000 and $1,762.52 in interest. Judgment was entered on August 18, 1986.

On September 2, 1986, U-Haul filed its notice of motion for a new trial on the issue of damages. Martin filed his counter motion for new trial on the fraud and breach of the covenant of good faith and fair dealing causes of action on September 10, 1986. After a hearing, the court issued its decision on October 14, 1986, denying Martin's motion and granting U-Haul's motion for new trial based on excessive damages unless Martin agreed to a reduction of the damages to $725. The court on its own motion also struck the cost bills filed by the plaintiff.

Martin filed a timely notice of appeal on November 6, 1986.

### STATEMENT OF FACTS

Martin had been an independent U-Haul dealer for nine to ten years before August 31, 1981. He had started with U-Haul in the Los Angeles area and had moved to Modesto in 1969 or 1970. He became a "triple-A" U-Haul dealer in approximately 1978. A "triple-A" dealer is allocated more equipment to rent out to the public. In 1980 Martin's gross income from U-Haul rentals was $45,166.07, with his net commission on that amount being

$9,416.60. He also earned $503.87 from U-Haul repairs during 1980. During that same period, he earned about $35,000 from his Texaco service station. In 1981 he had earned $5,797.67 through August 8 from his U-Haul activities.

Richard Adamitz was the president of U-Haul in 1981. There were three officers and directors of the corporation. They were himself, Len Pickhartz and Paul Deaton. Pickhartz was vice president, and Deaton was secretary-treasurer. They had opened the U-Haul Moving Center in Modesto in April of 1979. Pickhartz became the manager of that location six to eight months later. The managers of the various moving centers were paid a salary and did not receive a commission from the rentals. The moving center is separate from the independent dealers. The independent dealers receive a commission of approximately 20 percent of their gross revenue. The dealers send their gross receipts to U-Haul and are sent their commissions in return. Each Monday Martin would send in the gross receipts from the U-Haul rentals and then received his commission check about six weeks later.

There are several forms which U-Haul requires its independent dealers to use. When renting the equipment, it requires them to always use the authorized U-Haul contract on which the driver's license of the renter must be recorded. This contract is necessary to keep track of the one-way rentals. There is also an authorized U-Haul deposit receipt to be used when a customer wishes to reserve a trailer. U-Haul also requires that a "Monday Report" be completed weekly which lets the company know exactly what equipment has been rented out in the preceding seven-day period and what equipment is on each independent dealer's lot.

U-Haul uses field men to maintain contact with its independent dealers. The field man prepares the "Dealer Service Reports" and also attempts to detect dishonesty among the independent dealers. U-Haul audited Martin prior to 1981, but this audit did not show that he had been renting out equipment without contracts and thereby collecting money himself which should have been sent to U-Haul. U-Haul had never found a discrepancy in his reports.

Adamitz had heard reports that Martin was renting equipment without reporting it to U-Haul. In August of 1981, he made arrangements for Cynthia Deaton, Paul Deaton's daughter, to go to Martin's station in Modesto and rent a trailer as a test of his procedures. He wanted to use her for this task because she had access to a pickup truck and looked believable. Cynthia, accompanied by her friend, Roberta Craig, went from Fresno to

Martin's station on August 25, 1981, to rent the trailer. She had called Martin a few days previously to ascertain the price of the trailer.

Martin testified that in the early afternoon of August 25, two girls came to the station and one asked to rent a trailer. She said she was going camping for a week and needed to rent a small trailer. He asked her for her driver's license. She replied that she did not have it with her but had left it at home in Turlock. Martin told her that she had to have her driver's license with her before she could take the trailer off the lot. He told her that she could leave a deposit to hold the trailer. She insisted on leaving the full amount of the rental as the deposit. Martin wrote the deposit on a Texaco invoice and told her that he would prepare the contract when she returned. She gave the name "Cindy Brown" and an address in Turlock. He gave the girls the tissue paper copy of the credit card receipt and put the hard copy on a clipboard and hung it on the wall. He had placed a note with the charge slip explaining which trailer was reserved and that the girl was coming back to get it.

Martin went home about 4 or 4:30 p.m. that day and left two of his employees, Bob Meyers and Don Baker, at the station. He had told Meyers and Baker that if the girls came back, they were to put the trailer rental on a contract and record the renter's driver's license number. Martin received a telephone call from Baker about 5 p.m. and returned to the station. When he arrived, the trailer was gone, and the contract had not been filled out. Martin had not been present when the trailer left the station. He went to get the hard copy of the receipt off the wall in his office, but it was gone as well. Baker had died prior to trial.

Martin sent his wife to Turlock to the address Ms. Deaton had given him, but she found no one at that address. When she returned, they both drove to Turlock. The resident of the house at that address did not know anyone named Brown.

On the morning of August 31, 1981, Adamitz, Pickhartz and Steven Baird, Martin's field man at the time, came to his Texaco station about 8:30 a.m. Adamitz showed him the hard copy of the Texaco receipt and said, "We have a problem." Martin told him that the girls had left without a contract and he would have them fill one out when they returned. Adamitz told him that the girls were not coming back, and they were there to take the U-Haul equipment from Martin. Two more men in U-Haul uniforms arrived and began taking the equipment. They blocked the aisles in his service station with their trucks. They refused to move the trucks when asked to move them. The U-Haul men were working on the trucks before

they took them away, leaving debris and oil for Martin to clean up. It took them all day to remove the equipment.

Baird used Martin's office to complete the necessary paperwork on the trailers and trucks in order to close out the books on them. Martin never received the "U-Haul Dealership Closeout Notice" which had been prepared because he refused to sign a copy of it. Neither did he receive a 30-day written notification of termination of his dealership.

Martin maintained that he had been "set-up" by Adamitz to make it look as if he had been stealing money from U-Haul so that they could have a pretext under which to close down his U-Haul dealership. He was planning to move from his Texaco station at 1401 Coffee Road in Modesto to a new location at 5th and "I" Streets where he would no longer sell gas but would perform auto repairs and expand his U-Haul operations. The lease at the Texaco station expired one month after he was closed down on August 31, 1981. The new location was close to the Modesto U-Haul Moving Center, and Martin believed that they did not want the competition. He had contacted John Wilson of U-Haul prior to August 25 to discuss moving his business. Wilson had told him to discuss it with his field man. He had also told Baird of his planned move prior to the August 25 visit by Ms. Deaton. Steven Baird, Martin's field man in 1981, stated that the independent dealers were competing with the U-Haul Moving Center for the same equipment and that Martin's new location was within a mile of the moving center. Baird had agreed to the move and had offered to help him move the trailers.

Nadine Coley was Martin's wife in 1981. She testified that when he returned home in the late afternoon of August 25, he had told her that two girls had been to the station to rent a trailer. She confirmed Martin's version of the events of that evening after they had received a telephone call from the station and left their home to go down there. Martin then asked her to go to Turlock. She did not find anyone at the address which she was given and returned to the station. Both she and Martin then went to Turlock to try to find the girls. She also confirmed that they often used Texaco credit card slips as deposit receipts. She stated that she had been with Martin for nine years while he had been a U-Haul dealer, during which time she prepared most of the Monday reports and that he had not been stealing money from U-Haul to her knowledge.

Robert Meyers had been employed by Martin in August of 1981 as a mechanic. He also rented out trailers. He corroborated Martin's version of the events of August 25, stating that the girls had come in and asked for a trailer but did not have a driver's license. He testified that they wanted to

pay for the trailer in advance so that it would not be rented out and that one of the girls said she would go back to Turlock so that she could get her license. He stated that the girls then returned about 4:30 or 5:30 that evening. They drove in at the rear of the station while he was in the service bay putting away his tools. They walked to the front of the station and then walked back to the trailer area with the other serviceman, Mr. Baker. Baker then came back to the front of the station because he had a gas customer. Meyers then saw the girls drive out of the station with the trailer. Meyers then called Martin who came to the station.

Meyers was also at the station on August 31, 1981, when the men from U-Haul came to take away the equipment. He also testified that they blocked the service bays so that he could not work on the cars. He asked them to move the trucks but they refused. The U-Haul personnel were there all day and were going through things that pertained only to the Texaco station and not to U-Haul. One tried to force open the door to Martin's private office.

Martin testified that he always used Texaco credit card invoices as deposit receipts. Henry Leer, his previous U-Haul field man, knew that he followed this practice. Someone would want to reserve a trailer in this fashion about four or five times a month. No one from U-Haul ever told him to use the official U-Haul deposit form instead of a Texaco credit card invoice.

Cynthia Deaton denied leaving Martin's Texaco station and returning for the trailer. She testified that Martin rented her the trailer even though she did not produce a driver's license and that he used a Texaco credit card invoice instead of a U-Haul contract. She denied getting the hard copy of the Texaco credit card slip from Martin's office. Roberta Craig, Ms. Deaton's friend, testified consistently with Ms. Deaton's version of the events of that day. Juanita Black and John Wilson, both employees of U-Haul of Fresno, testified that Ms. Deaton returned to Fresno that afternoon with a trailer between 3:30 and 5 p.m. Modesto was approximately a two-hour drive from the U-Haul office in Fresno.

Paul Deaton testified that he had no prior knowledge of the plan to have his daughter rent a trailer from Martin as a test of his procedures. He also stated that he had never tried to put an independent dealer out of business because he was competing with a moving center. Neither was Baird aware of any plan to take business away from the independent dealers. Baird had heard rumors that Martin had not been using U-Haul contracts and had reported these rumors to Adamitz. He did not know of the test of Martin's business practices or of the fact that they were going to close down his dealership until the morning of the 31st.

Leonard Pickhartz was the manager of the U-Haul Moving Center in Modesto in 1981. He had heard statements that Martin was "ripping off" the company and later received a note from Billy Oswald which stated that Martin was taking money from U-Haul and not using the correct rental forms. He did realize that the note had come from one of Martin's disgruntled employees who might have been fired. Martin testified that Oswald had worked for him for three days in July of 1981 and that he had fired him because Oswald had told him that he could make a lot of money by renting U-Haul equipment without using the proper contracts. Pickhartz never discussed Oswald's accusation with Martin.

Henry Leer had been one of Martin's U-Haul field men. In 1978 or 1979, another U-Haul dealer had shown him a Texaco credit card slip which he had received along with a trailer which had been returned to him. He discussed this with Martin who told him that he had instructed his employees to use the Texaco credit card slips if they were too busy at the time the equipment was rented and then to put it on a proper contract later. Leer told Martin to discontinue this practice and also informed Adamitz of this development. Leer had also altered Martin's trailers to determine if they were being used without that use being reported but was unable to produce any proof that Martin was cheating.

Adamitz testified that he felt Martin's U-Haul business was low in the area of the renting of local trailers and that the local trailers were the hardest to trace in the U-Haul system. He had heard several reports of trailers being rented on credit card receipts without U-Haul contracts and had decided to send someone in to test the rumors. He was not hoping to terminate Martin's dealership and actually wanted more dealers in Modesto. He instructed Juanita Black to make the arrangements to have Ms. Deaton rent a trailer from Martin as a test. He had not been otherwise involved in the test and, when he later heard that she had been able to rent a trailer without a contract, made the decision to close Martin's U-Haul operation. He did not tell anyone of his decision until the morning of August 31 when they went to Martin's dealership. He confronted Martin with the credit card slip and told him that their relationship would have to be terminated.

With respect to termination of a dealership, the U-Haul dealership contract provides: "This contract may be terminated by either party on thirty days written notice or without previous notice upon violation by the opposite party of any promise or condition heretofore mentioned. Upon termination of this contract for any reason, Dealer warrants, covenants, and agrees, that within the geographical limits of the county of his place of business, he will not represent or render any service either on his own behalf or in any

capacity for any other persons, firm, or corporation engaged in any rental business which offers the rental of equipment similar to that operated by Marketing Co. for the duration of the then existing telephone directory listing, plus a period of one year from the termination of such telephone directory listing."

Martin testified that when he first started with U-Haul, Henry Leer had told him "that if I did something wrong they could give me a 30-day notice." Even though he testified that he understood at the time he signed the contract that U-Haul could close him down without notice if he violated a provision of the contract, he stated at trial that he did not think U-Haul could close down his operation without notice.

In August of 1984, Martin began to draw Social Security disability payments. Martin has died during the time this appeal has been pending.

## DISCUSSION

## I

### WHETHER MARTIN'S CONTRACT DAMAGES ARE LIMITED TO THOSE ACCRUING IN THE 30-DAY PERIOD AFTER THE BREACH OF THE CONTRACT

■ Martin contends that the trial court erred when it granted U-Haul's motion for new trial subject to the condition that the motion would be denied if Martin would consent to a reduction in damages from $29,000 to $725. The basis for the decision was a finding that U-Haul's contract damages could not extend beyond the 30-day period in which U-Haul was permitted to terminate the dealership contract without cause. That contract provision, paragraph 16 in the U-Haul dealership contract, provides in pertinent part as follows: "This contract may be terminated by either party on thirty days written notice or without previous notice upon violation by the opposite party of any promise or condition heretofore mentioned."

■ "[W]hen a trial court grants a new trial on the issue of excessive damages, whether or not such order is conditioned by a demand for reduction, the presumption of correctness normally accorded on appeal to the jury's verdict is replaced by a presumption in favor of the order." (*Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 932 [148 Cal.Rptr. 389, 582 P.2d 980].) "The trial court's exercise of discretion in ruling on the new trial motion may be disturbed only where '. . . a manifest and unmistakable abuse of discretion clearly appears.' [Citation.] The admonition is particularly compelling when discretion is exercised in favor of granting the new

trial." (*County of San Diego* v. *Bressi* (1986) 184 Cal.App.3d 112, 119 [229 Cal.Rptr. 44].)

Although Martin devotes much of his argument on appeal to the question of whether or not the contract could only be terminated for good cause, he prevailed on this issue at trial when the jury found that U-Haul had breached the contract. The only issue here is that of the proper measure of damages.

Martin also contends that this was a contract of adhesion and, therefore, that the particular provision cannot be used to limit damages. However, he never pursued this theory in his opposition to the motion for new trial and may not do so now. ■ A trial court may not be held to have abused its discretion as to a particular issue which it was never asked to consider. (*Ernst* v. *Searle* (1933) 218 Cal. 233, 240-241 [22 P.2d 715]; *Guardians of Turlock's Integrity* v. *Turlock City Council* (1983) 149 Cal.App.3d 584, 599 [197 Cal.Rptr. 303].)

■ This leaves the central issue of whether the contract provision which provides for the termination of the dealership contract upon 30 days' written notice effectively restricts the damages recoverable by either party to the contract to those attributable to that 30-day period.

In *Pecarovich* v. *Becker* (1952) 113 Cal.App.2d 309 [248 P.2d 123], the plaintiff had been employed as a coach of the defendants' San Francisco Clippers professional football team. The defendants breached the three-year contract of employment under which Pecarovich served when they informed him that they would no longer operate the football team and, therefore, did not intend to perform their part of the contract. The trial court had computed the plaintiff's damages based on the entire unexpired three-year term of the contract. The appellate court looked to the termination clause of the contract which gave the employer the option of terminating the agreement upon a 90-day written notice with specified payments to be made to the employee. It held that the trial court had erred in awarding damages for the entire unexpired term of the contract and remanded the action with direction to render a judgment reflecting the lower damage award required by the termination clause.

The *Pecarovich* contract provided for both a specified notice period and also a specified sum to be paid by the defendants. Here we only have the specified notice period. However, this is not a significant difference when considered in light of the authority relied upon by the *Pecarovich* court as well as the general principles of contract law. ■ As that court explained: "We have found no California decisions in point but judicial

decisions in other jurisdictions indicate that if a person refuses to perform a contract which is terminable by him upon certain conditions, the amount of money he would have to pay in exercising his election to terminate becomes the measure of damages for his breach." (*Pecarovich* v. *Becker, supra,* 113 Cal.App.2d at p. 317.)

The *Pecarovich* court cites several out-of-state authorities for the proposition that the contract damages are limited to the notice period. (*Pecarovich* v. *Becker, supra,* 113 Cal.App.2d at p. 318.) ■ As one of those cases explained within the context of an employment contract, "If the employer has the unconditional right to terminate the contract of employment after certain notice, discharge has the effect of notice to terminate and damages are allowed only up to the time the contract would have terminated if notice had been given." (*Bitterman* v. *Gluck* (1939) 256 App.Div. 336 [9 N.Y.S.2d 1007, 1008].)

In *Cline* v. *Smith* (1929) 96 Cal.App. 697 [274 P. 761], the court reached a similar conclusion. There a contract which had eight years to run was breached. The trial court had instructed the jury that, in arriving at proper measure of damages, it could consider the fact that the contract had eight years to run. The contract provided that " 'either party may terminate this contract at any time by giving to the other party sixty days notice of its intention to do so.' " (*Id.* at p. 699.) The Court of Appeal reversed. It held that the portion of the instruction permitting consideration of the fact that the contract had eight years to run was prejudicially erroneous "[i]n view of the company's right to terminate the contract at any time on sixty days' notice . . . ." (*Id.* at p. 702.) Therefore, although not expressly restricting damages to a 60-day period, it implied that that would be the proper measure and did explicitly find that permitting damages based on the total unexpired term of the contract was erroneous in light of the termination provision.

In the venerable case of *Jewell* v. *Colonial Theater Co.* (1910) 12 Cal.App. 681 [108 P. 527], a contract for the employment of an actress contained a provision stating, " 'This contract may be cancelled at any time after the first performance by either party giving two weeks' notice in writing to the other.' " (*Id.* at p. 683.) Before the expiration of the plaintiff's contract, the theater closed, and she was dismissed without receiving the required two weeks' notice. The appellate court found that she was properly awarded her salary for the two-week period following her discharge as part of her damages. (*Id.* at p. 684.)

California Civil Code section 3300 provides for the general measure of damages for a breach of contract. It reads: "For the breach of an obligation

arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom."

■ California case law has long held the correct measure of damages to be as follows: "Damages are awarded in an action for breach of contract to give the injured party the benefit of his bargain and insofar as possible to place him in the same position he would have been in had the promisor performed the contract. [Citations.] Damages must be reasonable, however, and the promisor is not required to compensate the injured party for injuries that he had no reason to foresee as the probable result of his breach when he made the contract. [Citations.]" (*Coughlin* v. *Blair* (1953) 41 Cal.2d 587, 603 [262 P.2d 305]; accord *Glendale Fed. Sav. & Loan Assn.* v. *Marina View Heights Dev. Co.* (1977) 66 Cal.App.3d 101, 123 [135 Cal.Rptr. 802]; *Bravo* v. *Buelow* (1985) 168 Cal.App.3d 208, 215 [214 Cal.Rptr. 65].)

Witkin explains the "foreseeability" rule when he states: "The requirement of *knowledge or notice* as a prerequisite to the recovery of special damages is based on the theory that a party does not and cannot assume limitless responsibility for all consequences of a breach, and that at the time of contracting he must be advised of the facts concerning special harm which might result therefrom, in order that he may determine whether or not to accept the risk of contracting." (1 Witkin, Summary of Cal. Law (9th ed. 1987) § 815, p. 733, original italics.)

■ The specific rule that a termination clause limits recoverable damages to the notice period is consistent with the general requirement that contract damages are limited to those foreseeable by the parties at the time of contracting. Parties who agree that a contract may be terminated for any reason, or no reason, upon the giving of the specified notice could not reasonably anticipate that damages could exceed that notice period.

■ In the case at bench, Martin testified both at trial and during his deposition that he agreed to the 30-day notice provision. At trial he was questioned as follows:

"Q. Didn't you agree to that, that they could cancel you at any time without, for a reason or no reason, on 30 days notice?

"A. I may have agreed to that, but that don't mean it's true.

"Q. And you didn't see anything wrong with that, did you?

"A. No."

At his deposition, he responded to questions on this issue in a similar fashion.

"Question: Isn't it true, Mr. Martin, that you knew when you first become [*sic*] a U-Haul dealer on Coffee Road that U-Haul had an absolute right to cancel you for any reason, or no reason, on 30 days notice?

"Answer: That's right.

"Question: You knew that all the time?

"Answer: Yes.

"Question: And you agreed to that?

"Answer: That's right.

"Question: And you didn't see anything wrong with that?

"Answer: No."

Having consciously agreed to and understood the effect of the 30-day notice provision at the time he entered into the dealership contract, Martin may not now avoid the impact of the provision to which he freely assented.

■ Civil Code section 3358 provides in pertinent part, "no person can recover a greater amount in damages for the breach of an obligation, than he could have gained by the full performance thereof on both sides." "Thus, courts will not, except where exemplary damages are awarded, permit a party to a contract to recover more on the breach thereof than he would have received by due performance of the agreement." (23 Cal.Jur.3d, Damages, § 47, p. 78.) ■ If U-Haul had followed the notice requirements in its dealership contract, it could have terminated Martin's dealership after providing a 30-day notice. Full performance by U-Haul would only have resulted in an additional 30 days of U-Haul dealership business for Martin. That 30-day period is all that Martin could reasonably be assured of remaining in business.

Because of the 30-day notice provision neither party to the dealership contract could reasonably anticipate that damages resulting from a breach of that contract would exceed those potentially accruing during a 30-day period after the breach. Furthermore, awarding the wronged party damages

which exceed those attributable to the 30 days immediately following the breach would place that party in a better position than that resulting if the breaching party had performed in accordance with the terms of the agreement. Therefore, the trial court was correct when it granted the new trial motion conditioned upon Martin's consent to a reduction in the damage award from $29,000 to $725.

## II

### Whether the Court Erred in Granting the Nonsuit Motion as to the Cause of Action for Breach of the Covenant of Good Faith and Fair Dealing

In his supplemental brief, Martin's counsel urges three bases for his contention that the lower court erred when it granted the motion for nonsuit on the cause of action for breach of the covenant of good faith and fair dealing. They are (1) a special relationship existed between Martin and U-Haul; (2) there was no significant distinction between Martin and an at-will employee; and (3) even absent a special relationship, an action stemming from an alleged bad faith breach of the covenant within the context of an ordinary commercial contract may sound in tort. All three contentions are without merit.

In *Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co.* (1984) 36 Cal.3d 752 [206 Cal.Rptr. 354, 686 P.2d 1158], the California Supreme Court reaffirmed that "the law implies in *every* contract a covenant of good faith and fair dealing." (*Id.* at p. 768, original italics.) However, it specifically stopped short of holding that a cause of action sounding in tort arose in every instance where this covenant may have been breached. As the court explained: "While the proposition that the law implies a covenant of good faith and fair dealing in all contracts is well established, the proposition advanced by Seaman's—that breach of the covenant always gives rise to an action in tort—is not so clear. In holding that a tort action is available for breach of the covenant in an insurance contract, we have emphasized the 'special relationship' between the insurer and insured, characterized by elements of public interest, adhesion, and fiduciary responsibility. [Citation.] No doubt there are other relationships with similar characteristics and deserving of similar legal treatment.

"When we move from such special relationships to consideration of the tort remedy in the context of the ordinary commercial contract, we move into largely uncharted and potentially dangerous waters. Here, parties of roughly equal bargaining power are free to shape the contours of their agreement and to include provisions for attorney fees and liquidated

damages in the event of breach. They may not be permitted to disclaim the covenant of good faith but they are free, within reasonable limits at least, to agree upon the standards by which application of the covenant is to be measured. In such contracts, it may be difficult to distinguish between breach of the covenant and breach of contract, and there is the risk that interjecting tort remedies will intrude upon the expectations of the parties. This is not to say that tort remedies have no place in such a commercial context, but that it is wise to proceed with caution in determining their scope and application." (36 Cal.3d at pp. 768-769, fns. omitted.)

The *Seaman's* court then went on to find tort liability on a basis distinct from breach of the implied covenant. (*Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co., supra,* 36 Cal.3d at p. 769.) ■ As Justice Woolpert of this court has explained: "The facts in *Seaman's* did not require the court to examine conduct in the *performance* of the contract. Instead, the court described a new intentional tort, finding 'it is not even necessary to predicate liability on a breach of the implied covenant.' The new tort: '[A] party to a contract may incur tort remedies when, in addition to breaching the contract, it seeks to shield itself from liability by denying, in bad faith and without probable cause, that the contract exists.' [Citation.] Under these circumstances, no special contractual relationship is required. The court avoided plotting additional courses through 'uncharted waters.' " (*Quigley* v. *Pet, Inc.* (1984) 162 Cal.App.3d 877, 890 [208 Cal.Rptr. 394].)

In the instant case, there has been no denial of the existence of the contract. Therefore, any tort liability must be predicated upon U-Haul's alleged bad faith actions in the performance of the contract. Decisions since *Seaman's* have continued to stress the requirement that there be a special relationship between the parties before a tort cause of action for breach of the implied covenant of good faith and fair dealing will lie. ■ As succinctly stated in *Premier Wine & Spirits* v. *E. & J. Gallo Winery* (E.D.Cal. 1986) 644 F.Supp. 1431, affirmed (9th Cir. 1988) 846 F.2d 537: "To establish Premier's tort claim for breach of the covenant of good faith and fair dealing, California law requires, as a threshold showing, proof of a 'special relationship' between the parties characterized by elements of public interest, adhesion and fiduciary responsibility. [Citation.] California courts have not extended the 'special relationship' doctrine to include ordinary commercial contractual relationships such as the supplier-distributor relationships present here." (*Id.* at p. 1436; accord *Multiplex Ins. Agency, Inc.* v. *California Life Ins. Co.* (1987) 189 Cal.App.3d 925, 937 [235 Cal.Rptr. 12] and *Commercial Cotton Co.* v. *United California Bank* (1985) 163 Cal.App.3d 511, 516 [209 Cal.Rptr. 551, 55 A.L.R.4th 1017].)

We, therefore, reject Martin's contention that tort damages may be awarded for a breach of the covenant of good faith and fair dealing absent some special relationship between the parties.

The inquiry then turns to the issue of whether or not such a special relationship exists. This tort found its genesis within the special relationship of the insurance context. (See *Comunale* v. *Traders & General Ins. Co.* (1958) 50 Cal.2d 654 [328 P.2d 198, 68 A.L.R.2d 883] and *Crisci* v. *Security Ins. Co.* (1967) 66 Cal.2d 425 [58 Cal.Rptr. 13, 426 P.2d 173].) Courts have also sustained its viability when the relationship between the parties was one of employer/employee (*Cleary* v. *American Airlines, Inc.* (1980) 111 Cal.App.3d 443, 455 [168 Cal.Rptr. 722]) or bank/depositor (*Commercial Cotton Co.* v. *United California Bank, supra,* 163 Cal.App.3d 511, 516). However, the courts have consistently declined to expand liability for this tort into other types of contract-based disputes.

In *Commercial Cotton, supra,* the court stressed the importance of "public interest, adhesion, and fiduciary responsibility" in looking at whether a special relationship existed. (*Commercial Cotton Co.* v. *United California Bank, supra,* 163 Cal.App.3d at p. 516.) Similarly, in *Wallis* v. *Superior Court* (1984) 160 Cal.App.3d 1109 [207 Cal.Rptr. 123], the court examined several facets of insurance contracts which distinguish them from ordinary commercial contracts. That court stated: "As noted earlier, the *Seaman['s]* court intimated that a noninsurance contract could be tortiously breached if it contained characteristics similar to those which allow a finding of tortious breach in an insurance contract. (36 Cal.3d at p. 769.) For purposes of serving as predicates of tort liability, we find that the following 'similar characteristics' must be present in a contract: (1) the contract must be such that the parties are in inherently unequal bargaining positions; (2) the motivation for entering the contract must be a nonprofit motivation, i.e., to secure peace of mind, security, future protection; (3) ordinary contract damages are not adequate, because (a) they do not require the party in the superior position to account for its actions, and (b) they do not make the inferior party 'whole'; (4) one party is especially vulnerable because of the type of harm it may suffer and of necessity places trust in the other party to perform; and (5) the other party is aware of this vulnerability." (*Id.* at p. 1118.)

Martin's counsel asserts that "the only element not technically met in the *Wallis* criteria is the fact that MARTIN had entered into the contract with U-HAUL for remuneration," and that, therefore, a special relationship could still have existed between U-Haul and Martin. This argument falls short for two reasons. First, this missing element is a crucial factor in deciding whether or not a special relationship exists. It is of paramount importance that the reason for the contract be "to secure peace of mind, security, future protection." That is what makes the relationship a "special" one.

Second, contrary to Martin's assertion, all the other factors are not present in this case; indeed, none of them are. The parties were not in "an

inherently unequal bargaining position." Although it is true that U-Haul was a larger business organization, this is not the thrust of this factor. In the vast majority of business transactions, one enterprise will be larger than the other. Martin was a service station owner who rented U-Haul equipment as a sideline. This was an arm's-length transaction; Martin could have chosen to do business with any of several other equipment rental firms. Similarly, contract damages were adequate. Martin could have been compensated for the loss of income attributable to the 30-day period following the termination as the total of his expectancy interest under the contract.

Finally, there was no special vulnerability on Martin's part. True, Martin could not rent U-Haul equipment without U-Haul. However, he could theoretically rent out other similar equipment from U-Haul's competitors. But more importantly, this was a sideline business from which Martin garnered income additional to that of his Texaco station; this was not his sole means of earning a living as is generally the case in wrongful termination actions.

The facts of the two cases most closely analogous to the instant situation uphold this view. In *Premier Wine & Spirits, supra,* Premier was a distributor for Gallo but also distributed products for other wineries. A dispute arose and Premier brought an action which alleged, in part, a breach of the covenant of good faith and fair dealing on the part of Gallo. The federal district court looked at the *Wallis* factors as well as at this court's decision in *Quigley.* It concluded: "The supplier-distributor relationship here cannot be described as having a non-profit motivation; profit is the principal basis of such a relationship. Furthermore, Premier has continued as distributor of product lines from a multitude of suppliers, and was appointed as distributor of the Inglenook line of wines following termination. Therefore, Premier cannot be described as being especially vulnerable to a termination by Gallo." (*Premier Wine & Spirits* v. *E. & J. Gallo Winery, supra,* 644 F.Supp. at pp. 1436-1437.)

The independent dealer status of Martin is analogous to that of Premier. This was an ordinary commercial relationship, not a "special" one.

Similarly, the situation in *Quigley, supra,* 162 Cal.App.3d 877 is also relevant to the instant analysis. Quigley had contracted to haul raw walnuts for Pet, a large agricultural corporation. Pet was alleged to have breached the contract by failing to honor the agreed rate schedule. Quigley brought an action for breach of contract, tortious interference with business relations, intentional infliction of emotional distress and breach of the implied duty of good faith and fair dealing arising out of their contract. This court addressed the issue of an asserted special relationship as follows: "Quigley

Bros. and Pet are commercial enterprises. Quigley is a corporate shareholder. There was no special relationship which removed the parties from usual commercial contract rules. At the inception of the contract the bargaining position of the parties was equal; Quigley willingly accepted the contract rate.

"The contractual relationship was entered into for the usual business reason of profit which can be assured by ordinary contract damages if a failure of performance occurred. Although perhaps financially vulnerable because of the importance of the contract, plaintiffs' hauling business was one in which profit or loss was foreseeably dependent upon a multitude of circumstances. As noted in the *Seaman's* dissent, in most cases purposeful breaches of contract are to be anticipated with only contract damages as the remedy." (*Quigley* v. *Pet, Inc., supra,* 162 Cal.App.3d at p. 893.)

Therefore, even though the contract with Pet constituted a major portion of Quigley's business, this court did not equate that type of vulnerability with that which is required before a court will allow a cause of action for breach of the covenant of good faith and fair dealing to proceed or a judgment based upon that tort to be upheld. Martin was even less vulnerable than Quigley in that his U-Haul business was merely a sideline. No special relationship was present in this situation.

Finally, appellate counsel agrees that Martin was not an employee of U-Haul but urges this court to hold that he was some sort of quasi-employee and that, therefore, this tort action could proceed. However, as has already been discussed, the employer/employee relationship is merely one type of special relationship which will sustain this tort. As Martin was not an employee and there was no other special relationship, this contention is without merit.

Because there was no "special relationship" between Martin and U-Haul and what was at issue was an ordinary commercial transaction and because California law has not extended this tort to normal commercial contracts, the granting of the motion for nonsuit on the cause of action for breach of the covenant of good faith and fair dealing was proper.

III, IV*

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

---

*See footnote, *ante*, page 396.

## DISPOSITION

The order conditionally granting the motion for new trial is affirmed. The case is remanded to the trial court for the purpose of allowing plaintiff to elect whether to accept the $725 or request a new trial on the issue of damages for breach of the contract. The judgment entered in favor of defendant on the first and second causes of action of plaintiff's complaint is affirmed.

Costs are awarded to defendant.

Ardaiz, J., and Brown (G. A.), J.,* concurred.

A petition for a rehearing was denied September 2, 1988.

---

* Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.