No. 85-455

IN THE SUPREME COURT OF THE STATE OF MONTANA

1986

_____

TERRENCE DUNFEE and PATRICIA DUNFEE,

        Plaintiffs and Respondents,

   -vs-

BASKIN-ROBBINS, INC.,

        Defendant and Appellant.

_____

APPEAL FROM: District Court of the Second Judicial District,
In and for the County of Silver Bow,
The Honorable Mark Sullivan, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        James A. Robischon argued, Butte, Montana
        Terese Lowney Garrett, Glendale, California

    For Respondent:

        Knight, Dahood, McLean & Everett; Bernard Everett
        argued, Anaconda, Montana

    For Amicus Curiae: (International Franchise Assoc.)

        Anderson, Brown, Gerbase, Cebull & Jones; James L.
        Jones, Billings, Montana
        Andrew A. Caffey, Washington, D.C.
        Lewis G. Rudnick, Chicago, Illinois

_____

Submitted: April 1, 1986

Decided: June 4, 1986

Filed: JUN 4 - 1986

_____
Clerk

Mr. Justice Frank B. Morrison, Jr., delivered the Opinion of the Court.

This is an appeal from judgment entered upon a jury verdict in the Second Judicial District. The jury found in favor of plaintiffs, assessing compensatory damages in the amount of $232,138.88 and $300,000 in punitive damages. Defendant appeals. We affirm.

Baskin-Robbins, Inc. (appellant) and Terrance Dunfee and Patricia Dunfee (respondents) entered into a franchise contract for the operation of a Baskin-Robbins store in Butte, Montana. Initially appellant explored the possibility of locating a store in the Butte Plaza Shopping Center but was unable to secure a space. Subsequently, a site was obtained across Harrison Avenue in the "Raymond Mini-Mall." Appellant signed a lease with Raymond on October 5, 1979, and commenced construction at the Mini-Mall site.

Respondents first saw the Baskin-Robbins store in July, 1980, and decided to approach appellant about the business. Respondents submitted a franchise application on July 31, 1980. Following interviews and training sessions sponsored by appellant, the respondents signed the franchise contract on October 29, 1980. Prior to signing respondents consulted legal counsel, who suggested certain changes in the franchise agreement. Appellant insisted the standard agreement be signed without change and this was done.

The purchase price of the store was $71,000. The respondents obtained the funds through a loan from Montana Bank guaranteed by the Small Business Administration.

The store opened on October 29, 1980, and sales were brisk through the first 10 months of operation. In the spring of 1981, the parking lot in front of the store was

2

paved pursuant to the contract between appellant and the Raymond Mini-Mall. The paving of the lot reduced the amount of parking and also changed the flow of traffic so that automobiles entering from Harrison Avenue could not exit upon the same thoroughfare. Rather, customers had to drive out through an alley, over a large hump to a side street. The respondents received numerous complaints about traffic flow. Thereafter, sales slumped dramatically. During the first 10 months of operation, the store averaged $13,359 in monthly sales; the next twelve months the average monthly sales dipped to $8,088.

In the fall of 1981, the respondents had problems making their payments. A representative from the Small Business Administration evaluated the business and recommended it be sold. Respondents were advised the store was in a poor location. Thereafter, respondents sought to persuade appellant that the store should be moved across Harrison Avenue to the Butte Plaza Shopping Center. Terrance Dunfee began discussing the possibility of relocation with Harold Donahue, manager of the Plaza Shopping Center. The Plaza had no similar store and Donahue encouraged the move. There was a vacancy next to the movie theatre. Mr. Dunfee spoke to Sharon McCarthy, District Manager for Baskin-Robbins, about the move. McCarthy consulted with Baskin-Robbins' Division Manager, Bob Miller. No written correspondence reflected any discussions between Miller and McCarthy.

Site location, under the franchise agreement, exclusively belonged to Baskin-Robbins. Any site relocation had to be authorized and approved by a Baskin-Robbins Vice President. The vice president in charge was never consulted by McCarthy or Miller regarding relocation of the store.

3

Patricia Dunfee testified that Sharon McCarthy told her Baskin-Robbins could not move because they were committed to a fifteen year lease in the Raymond Mini-Mall. However, the Baskin-Robbins lease with the Raymond Mini-Mall had a termination right after five years and a right to sublease at any time. These facts were not communicated to respondents. Sharon McCarthy testified, contrary to the testimony of Patricia Dunfee, that she only told respondents that relocation was not in their best interests.

Following denial of the relocation request, and continued losses each month, the respondents closed the store on August 23, 1982. The Small Business Administration took possession and sold the store in December, 1982 for $25,000. As of April 9, 1983, the respondents still owed over $82,000 in long term debts on the business.

The respondents filed this action on May 26, 1983, alleging breach of fiduciary duty, breach of the implied covenant of good faith and fair dealing, and fraud. The case was submitted to a jury on a general verdict form. Following a plaintiffs' verdict appellant filed this appeal raising the following issues:

1. Whether the court properly instructed the jury that Baskin-Robbins owed a fiduciary duty to the Dunfees?

2. Whether the District Court properly instructed the jury on the duty of good faith and fair dealing?

3. Whether there was substantial credible evidence in the record to support submission of the case to the jury on either theory?

4. Whether the evidence supported an award for emotional distress damages?

5. Whether there was sufficient evidence in the record to support submission of a punitive damage issue to the jury?

4

ISSUE ONE

Whether the court properly instructed the jury that Baskin-Robbins owed a fiduciary duty to the Dunfees?

Generally a franchisor does not owe a fiduciary duty to a franchisee. Picture Lake Campground v. Holiday Inns, Inc. (E.D. Va. 1980), 497 F.Supp. 858, 869 ("[a] franchise relationship is inherently a business relationship, not a fiduciary relationship"). Accord Amoco Oil Company v. Cardinal Oil Co., Inc. (E.D. Wis. 1982), 535 F.Supp. 661, 666 (court refused to allow amendment of pleadings on the ground that a breach of fiduciary duty complaint failed to state a claim for relief in action by franchisee against franchisor); Murphy v. White Hen Pantry, Inc. (7th Cir. 1982), 691 F.2d 350, 354 ("the [district] court correctly determined that there was no legal basis for the argument that [franchisor] owed a fiduciary duty to [franchisee]").

Respondents recognize the general rule that under a franchise agreement a fiduciary relationship does not ordinarily develop. However, the respondents argue that special trust and confidence was reposed by the respondents in the expertise of appellant and that under the authority of Deist v. Wachholz (Mont. 1984), 678 P.2d 188, 41 St.Rep. 286, a fiduciary duty resulted.

When a fiduciary duty exists the one in the stronger position owes an obligation, by virtue of that trust relationship, to act in the best interests of the beneficiary. Deist v. Wachholz, supra.

We find that we need not decide whether the special facts and circumstances of this case gave rise to a fiduciary duty on the part of appellant. Although fiduciary duty was defined in the instructions, the court only held appellant to the responsibility of acting in good faith and dealing fairly

5

with respondents. The questioned instruction is court's instruction no. 15 which stated:

> YOU ARE INSTRUCTED THAT a fiduciary relationship exists in all cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith, and with due regard to the interests of the one reposing the confidence. A fiduciary relationship implies a condition of superiority held by one of the parties over the other.
>
> A fiduciary relationship may exist when there is both a reposing of faith, confidence and trust, the placing of reliance by one person on the judgment and advice of another, and the acceptance by the other of the confidence reposed in him. There must exist a just foundation for a belief that in giving advice or presenting arguments one is acting not in his own behalf, but in the interest of the other party.

A careful reading of this instruction shows that the court defined fiduciary relationship as being a relationship where one person has reposed trust and confidence in another person and that for the relationship to exist the stronger person must be acting in the interest of the other party and not in his own behalf. The entire second paragraph of the instruction is definitional. The only duty stated in the instruction is found in the first sentence where the court advised the jury that, where a fiduciary relationship exists, one is bound to act in good faith, and with due regard to the interests of the one reposing the confidence. Instruction no. 15 must be read in conjunction with instruction no. 16 which stated:

> YOU ARE INSTRUCTED that a party who has a fiduciary duty in its relationship with another party has a duty to act in good faith in its dealings with the other party.

When read together the instructions informed the jury that a person in a fiduciary relationship owes an obligation to deal fairly and in good faith. The court did not instruct the jury that liability attached if Baskin-Robbins acted in

6

their own interest to the detriment of the interest of Dunfees.

Instruction no. 15 is not artfully worded. However, the instruction is not clearly erroneous nor does the instruction, when read with the other instructions, substantially prejudice the interests of appellant.

ISSUE TWO

Whether the District Court properly instructed the jury on the duty of good faith and fair dealing?

Appellant objects to court's instruction no. 13 which amplified upon the obligation of dealing fairly and in good faith. That instruction stated:

> YOU ARE INSTRUCTED THAT in every contract, such as the contract with BASKIN-ROBBINS, INC. in this case, there is an implied covenant that neither party shall do anything which will have the effect of injuring the right of the other party to receive the benefit of the contract, which means that in every contract there exists an implied covenant of good faith and fair dealing.

Appellant argues that this instruction does not accord with the definition set forth recently by this Court in Nicholson v. United Pacific Ins. Co. (Mont. 1985), 710 P.2d 1342, 42 St.Rep. 1822.

In Nicholson we stated:

> But whether performing or breaching, each party has a justifiable expectation that the other will act as a reasonable person. Neal v. Farmers Ins. Exchange (Cal. 1978), 582 P.2d 980. The nature and extent of an implied covenant of good faith and fair dealing is measured in a particular contract by the justifiable expectations of the parties. Where one party acts arbitrarily, capriciously or unreasonably, that conduct exceeds the justifiable expectations of the second party. The second party then should be compensated for damages resulting from the other's culpable conduct.

710 P.2d 1348, 42 St.Rep. 1829.

The Nicholson case had not been decided at the time the court instructed this jury. Court's instruction no. 13 does however contain the language approved by this Court in Gibson

7

v. Western Fire Ins. Co. (Mont. 1984), 682 P.2d 725, 41 St.Rep. 1048. In that case Justice Sheehy defined the implied covenant of good faith and fair dealing as follows:

> The duty to accept a reasonable offer within policy coverage limits arises from an implied covenant of good faith and fair dealing that neither party will do anything which will injure the right of the other to receive the benefits of the agreement.

682 P.2d 730, 41 St.Rep. 1050.

The District Court was offered, in place of the given instruction, defendant's proposed instruction no. 7 which stated:

> You are instructed that both parties to any commercial transaction have the duty to fairly deal with each other in good faith. Good faith is defined as meaning honesty in fact in the conduct or transaction involved.
>
> Therefore, in this case if you find that the Defendant did some dishonest act or acts that harmed the Plaintiffs, then it is guilty of the tort of bad faith and liable for any damages proximately caused thereby.
>
> Conversely, if you find that Defendant did not do anything dishonest in its dealing with the Plaintiffs, then your verdict must be in favor of the Defendant.

The court wisely chose to refuse the defendant's offered instruction. In McGregor v. Mommer (Mont. 1985), 714 P.2d 536, 43 St.Rep. 206, this Court held that it was insufficient to define good faith as "honesty in fact." While the majority did not specifically disapprove of good faith as "honesty in fact," the majority did hold that a more complete duty had to be submitted to the jury. The trial court here, gave a more complete definition. In fact the court gave, nearly verbatim, the definition previously approved by this Court in Gibson, supra.

The implied covenant of good faith and fair dealing has presented problems in its application. In a commercial setting we now have held that where the conduct of one party

unreasonably breaches the justifiable expectations of the other party, an action in tort results. Nicholson v. United Pacific Ins. Co., supra. The rule, whether defined as the District Court defined it here, or as defined in Nicholson, should allow for the functioning of a free enterprise marketplace. Parties must be permitted to openly and forthrightly breach contracts electing to pay contract damages only.

The right to intentionally breach a contract is recognized in Nicholson, where the Court stated:

> Historically, a party to a contract generally had the right to breach and pay damages rather than perform. The non-breaching party, theoretically is "made whole" from the damages paid following the breach and thus still received benefits from the agreement.

The Court quoted with approval the following rule:

> "'Contract law is based in part upon the assumption that certain intentional breaches are to be encouraged. Permitting parties to breach their contracts promotes an efficient economy, at least when the gains from the breach exceed the expected pecuniary injuries of the promisee.'"

710 P.2d 1348, 42 St.Rep. 1829.

The Court's opinion in Nicholson then distinguished legitimate breaches of contract from activities which may constitute a tort. The Court said: "But whether performing or breaching, each party has a justifiable expectation that the other will act as a reasonable person." Id.

In the case at bar, the jury had to focus upon appellant's conduct in performing the contract rather than breaching the contract. Under the franchise agreement, appellant had the exclusive right to determine site location and the inquiry necessarily evaluated the reasonableness of appellant's conduct in light of the reasonable expectations of the parties to the franchise agreement.

Were this case to be tried following the Nicholson decision the court's instruction would reflect the rule stated in Nicholson. Not having the benefit of our discussion in Nicholson, the District Court gave an instruction quoting language from the Gibson decision rendered only a few months before the trial. The jury was given a fair and complete definition of "good faith" as defined by this Court. More cannot be asked of the trial judge.

ISSUE THREE

Whether there was substantial credible evidence in the record to support submission of the case to the jury on either theory?

Appellant contends there was insufficient evidence in the record to justify submission of appellant's lack of good faith to the jury. The controversy centers around appellant's refusal to remove the store from it's Raymond Mini-Mall location, across Harrison Avenue, to a location within the larger indoor Butte Plaza Mall.

Both appellant and respondents developed substantial evidence respecting the merits of relocation. The record contains evidence showing that business declined rapidly due to a change of traffic flow the year following the store's original opening. This change of circumstance, and the dire financial condition of the ice cream business in its existing location, may have reasonably triggered an inquiry regarding relocation. Unquestionably appellant had the sole contractual right to determine the location but the law imposes a duty upon appellant to reasonably consider the facts regarding relocation.

In determining whether a jury issue exists we must view the record in a light most favorable to respondents. First

National Bank in Libby v. Twombly (Mont. 1984), 689 P.2d 1226, 41 St.Rep. 1948.

Distilled to its essence, the respondents' case rests upon evidence that Sharon McCarthy, acting for appellant, advised Patricia Dunfee that Baskin-Robbins was tied to a fifteen year commitment at the Raymond Mini-Mall and could not move. In fact, Baskin-Robbins had a provision for sublease and a right to termination after five years. This information was not conveyed to the respondents and, therefore, respondents had no opportunity to find a subleasee and facilitate their move.

Respondents' proof further established the only person from appellant's organization who could authorize relocation, namely a vice president, was not told of the relocation question. Therefore, the merits of respondents' relocation argument were never considered by the only person who could authorize the move.

While this Court must recognize the contractual right of Baskin-Robbins to refuse relocation on the basis of cost or other economic circumstances, the law does impose a duty upon Baskin-Robbins to be reasonable in the exercise of that right. Respondents have presented evidence that vital information was withheld from them and from the vice president in charge of authorizing relocation. This evidence, if believed, would provide a basis for finding appellant acted unreasonably, thereby breaching it's duty to exercise good faith as defined by the court's instructions.

ISSUE FOUR

Whether the evidence supported an award for emotional distress damages?

The testimony at trial concerning the Dunfees' mental and emotional distress consisted of the following: Mr.

11

Dunfee said they were devastated and felt a sense of loss; Mrs. Dunfee testified that she was distraught and had lost her self-esteem. The Dunfees lived in the country and Mrs. Dunfee tried never to go into Butte; she felt ashamed as being recognized as a failure.

While the testimony given by the Dunfees shows mental and emotional distress, appellant argues that the distress is related to the business failure and not to denial of relocation. However, whether the respondents would have failed had the relocation been authorized was a question for the jury to consider. The jury was properly instructed on proximate cause and its members found that the mental distress damages were related to the appellant's unreasonable failure to evaluate relocation.

We hold there was a submissible jury issue on mental and emotional distress and although the award of $150,000 is generous we cannot say, as a matter of law, that the jury was moved by passion or prejudice.

ISSUE FIVE

Whether there was sufficient evidence in the record to support submission of a punitive damage issue to the jury?

Punitive damages are governed by § 27-1-221, MCA, which provides as follows:

> When exemplary damages allowed. (1) Subject to subsection (2), in any action for a breach of an obligation not arising from contract where the defendant has been guilty of oppression, fraud or malice, actual or presumed, the jury, in addition to the actual damages, may give damages for the sake of example and by way of punishing the defendant.

The issue of punitive damages went to the jury over appellant's objection that there was no evidence sufficient to raise an issue under the statute. The trial judge gave

12

the following instructions defining oppression, fraud and malice:

INSTRUCTION NO. 23

You are instructed that oppression is defined as an act of cruelty, severity, unlawful exaction or excessive use of authority. An act is oppressively done if done in a way or manner which violates the right of another person with unnecessary harshness or severity as by misuse or abuse of authority or power.

INSTRUCTION NO. 24

You are instructed that the abuse of authority or power is the essence of constructive fraud.

INSTRUCTION NO. 25

You are instructed that the standard for presumed malice sufficient to support an award for punitive damages under the laws of the State of Montana is as follows:

When a person knows or has reason to know of facts which create a high degree of risk or harm to the substantial interests of another, and either deliberately proceeds to act in conscious disregard of or indifference to that risk, or recklessly proceeds in unreasonable disregard of or indifference to that risk, his conduct meets the standard of willful, wanton and/or reckless to which the law of this State will allow imposition of punitive damages on the basis of presumed malice.

Instruction no. 23 is an accurate statement of the law as contained in Purcell v. Automatic Gas Dist., Inc. (Mont. 1983), 673 P.2d 1246, 1251, 40 St.Rep. 1997, 2003. Instruction no. 25 is a correct statement of the law taken from Owens v. Parker Drilling Co. (Mont. 1984), 673 P.2d at 1251, 41 St.Rep. at 69. Instruction no. 24 is not the statutory definition of constructive fraud as found in § 28-2-406. However, the language was taken from our opinion in Purcell v. Automatic Gas Dist., Inc., supra. Although instruction no. 24 could have been more complete, the conduct described is embraced within the definition of oppression as

13

the following instructions defining oppression, fraud and
malice:

INSTRUCTION NO. 23

You are instructed that oppression is
defined as an act of cruelty, severity,
unlawful exaction or excessive use of
authority. An act is oppressively done
if done in a way or manner which violates
the right of another person with unneces-
sary harshness or severity as by misuse
or abuse of authority or power.

INSTRUCTION NO. 24

You are instructed that the abuse of
authority or power is the essence of
constructive fraud.

INSTRUCTION NO. 25

You are instructed that the standard for
presumed malice sufficient to support an
award for punitive damages under the laws
of the State of Montana is as follows:

When a person knows or has reason to know
of facts which create a high degree of
risk or harm to the substantial interests
of another, and either deliberately
proceeds to act in conscious disregard of
or indifference to that risk, or reck-
lessly proceeds in unreasonable disregard
of or indifference to that risk, his
conduct meets the standard of willful,
wanton and/or reckless to which the law
of this State will allow imposition of
punitive damages on the basis of presumed
malice.

Instruction no. 23 is an accurate statement of the law
as contained in Purcell v. Automatic Gas Dist., Inc. (Mont.
1983), 673 P.2d 1246, 1251, 40 St.Rep. 1997, 2003.
Instruction no. 25 is a correct statement of the law taken
from Owens v. Parker Drilling Co. (Mont. 1984), 673 P.2d at
1251, 41 St.Rep. at 69. Instruction no. 24 is not the
statutory definition of constructive fraud as found in
§ 28-2-406. However, the language was taken from our opinion
in Purcell v. Automatic Gas Dist., Inc., supra. Although
instruction no. 24 could have been more complete, the conduct
described is embraced within the definition of oppression as

13

stated in instruction no. 23. Any error in the incompleteness of instruction no. 24, when viewed in conjunction with instruction no. 23, is harmless.

The question remains whether there was sufficient evidence to submit punitive damages to the jury. In First National Bank in Libby v. Twombly, supra, we said:

> When the duty to exercise good faith is imposed by law rather than the contract itself . . . the breach of that duty is tortious. Therefore, punitive damages are recoverable if the [breaching party's] conduct is sufficiently culpable.

689 P.2d 1230, 41 St.Rep. 1948.

In the present case, viewing the evidence in a light most favorable to the Dunfees, a jury question was raised as to fraud, oppression and malice on the part of Baskin-Robbins. According to the respondents' testimony, appellant failed to properly review their relocation request and did not attempt to renegotiate the Mini-Mall lease. Furthermore, Sharon McCarthy, if Patricia Dunfee is believed, misrepresented material facts with respect to the underlying lease between Baskin-Robbins and the Raymond Mini-Mall. In furtherance of her vindictive attitude she refused to deliver any of the facts to the vice president, the only one who could make a decision favorable to the Dunfees' relocation request.

The evidence on punitive damages presents this Court with a close question. When the question for jury submission is a close one, doubt should be resolved in favor of the jury deciding a fact issue. In Jacques v. Montana National Guard (1982), 199 Mont. 493, 649 P.2d 1319, we quoted from Mr. Justice Black's dissenting opinion filed in Galloway v. United States (1943), 319 U.S. 372, 63 S.Ct. 1077, 87 L.Ed. 1458 wherein he said:

14

As for myself, I believe that a verdict should be directed, if at all, only when, without weighing the credibility of the witnesses, there is in the evidence no room whatever for honest difference of opinion over the factual issue and controversy. I shall continue to believe that in all other cases a judge should, in obedience to the command of the seventh amendment, not interfere with the jury's function. Since this is matter of high constitutional importance, appellate courts should be alert to insure the preservation of this constitutional right even though each case necessarily turns on its peculiar circumstances.

In *Jacques* we adopted the standard articulated by Justice Black for the purpose of measuring directed verdict questions. When the standard is here applied, we find the respondents' evidence sufficient to take the case to the jury on the question of punitive damages.

Judgment for plaintiffs is affirmed.

_____
                Justice

We Concur:

_____
        Chief Justice

_____

_____

_____
        Justices

15

Mr. Justice Fred J. Weber dissents as follows:

I would reverse the District Court because I conclude there was not sufficient evidence to support a punitive damage award of $300,000.

As stated in the majority opinion, the question is whether there was sufficient evidence to submit the issue of punitive damages to the jury. The majority concluded that a review of the evidence in a light most favorable to the Dunfees resulted in a conclusion that a jury question had been raised as to fraud, oppression and malice on the part of Baskin-Robbins. The majority opinion then refers to three factual bases for this conclusion:

> (1) According to the Dunfees' testimony, Baskin-Robbins failed to properly review the Dunfee relocation request and did not attempt to renegotiate the lease;
>
> (2) The Dunfees testified that District Manager Sharon McCarthy of Baskin-Robbins misrepresented material facts with respect to the underlying lease;
>
> (3) In furtherance of District Manager McCarthy's "vindictive attitude" she refused to deliver any of the facts to the Vice President of Baskin-Robbins, the only one who could make a favorable decision for relocation.

I will discuss these in more detail.

With regard to (1), I conclude that the Dunfees did not prove a failure by Baskin-Robbins to review the relocation request. The evidence submitted without contradiction by Baskin-Robbins shows that the relocation request was considered by Sharon McCarthy, the District Manager for Baskin-Robbins, and that she forwarded the information to Division Manager Miller. In turn, Division Manager Miller discussed the move with Mr. Bovshow, Baskin-Robbins' Real

16

Estate Manager, and they both concluded that the relocation was not a good idea and disapproved it. Mr. Bovshow was the Baskin-Robbins representative originally involved in the location of the store in Butte. Even if we accept the testimony of Mrs. Dunfee that she was not told of the possibility of a sublease and of the 5 year termination possibility, the Dunfees have still failed to prove that Baskin-Robbins did not properly consider and reject their request for relocation. I conclude that there is a complete absence of evidence suggesting that Baskin-Robbins failed to properly review the relocation request.

With regard to (2), we have a difficult question because Mrs. Dunfee did testify that District Manager McCarthy misrepresented the underlying lease and its terms. However, if we start with the premise that Baskin-Robbins has a right to decide whether or not to authorize the change of location, the issue takes on a different light. Unless the majority is concluding that Baskin-Robbins had an obligation to renegotiate the lease, the misrepresentation of facts is not material. I have concluded that Baskin-Robbins was involved in an arms length transaction under which it properly could refuse to enter into a change of location, and I believe the majority essentially agrees with that conclusion. At that point, I must also conclude that there was no misrepresentation of a fact material to the rights of the Dunfees. Clearly the facts are not of the type sufficient to raise a jury question on fraud, oppression or malice.

With regard to (3), the majority emphasizes that "in furtherance of her vindictive attitude" District Manager McCarthy refused to deliver any of the facts to the Vice President of Baskin-Robbins, the only one who could make a

17

favorable relocation decision. I conclude that is not a correct factual analysis. The record does not in any way indicate that District Manager McCarthy refused to deliver any facts to the vice president of Baskin-Robbins. As district manager she passed this information on to her division manager, Mr. Miller. Mr. Miller in turn discussed the same with the Baskin-Robbins real estate manager, and they disapproved relocation. That determination was within the discretion granted to the division manager and the district manager by Baskin-Robbins. In view of their decision against relocation, there was no reason to pass the information on up the corporate ladder to the vice president. Presentation to the vice president of Baskin-Robbins was required only in the event that the lower level managers concluded that relocation was advisable. I therefore conclude there is a total absence of any proof of a vindictive attitude on the part of the officers or representatives of Baskin-Robbins involved in the failure to pass the information up to the vice president, he being the only one who could make a favorable decision for relocation.

I conclude there is an absence of evidence showing fraud, oppression or malice on the part of Baskin-Robbins. I then conclude the Dunfees failed to meet the minimum standard for proof of punitive damages, and that submission of the punitive damages issue to the jury constitutes reversible error.

I further disagree with the majority opinion in regard to Issue I, which pertains to the instruction on fiduciary duty. Instruction No. 15, which is quoted at length in the majority opinion, is extremely confusing. In this case it is an invitation to error so far as the jury is concerned.

18

There are no facts in the record which warrant an instruction on fiduciary relationship. The majority concludes that even though it may be true that there was no fiduciary relationship, the instructions are not reversible error because they require only an acting in good faith and fair dealing which is appropriate. I do not agree with that conclusion.

Under Instruction No. 15, it is possible that the jury could have concluded that a fiduciary relationship existed between Baskin-Robbins and the Dunfees because of a special confidence imposed in Baskin-Robbins, binding it in equity and good conscience to act in good faith and with due regard to the interests of the Dunfees. That relationship could be found to imply a condition of superiority by Baskin-Robbins over the Dunfees. The second paragraph of the instruction could be interpreted to mean that the fiduciary relationship of Baskin-Robbins exists because there was a reposing of faith, confidence and trust by the Dunfees. The last sentence could allow the jury to conclude that there was a requirement that Baskin-Robbins should act not in its own behalf but in the interest of the Dunfees. That idea is totally inappropriate to an arms length transaction with which we are here involved. I would therefore reverse because of this incomplete and misleading instruction.

I would reverse and remand for new trial.

Justice

We concur in the foregoing dissent of Justice Weber.

Chief Justice                    Justice

19