In re SIZZLER RESTAURANTS INTER-
NATIONAL, INC., Sizzler International,
Inc., Collins Properties, Inc., Tenly En-
terprises, Inc., Buffalo Ranch Steak-
houses, Inc.

Bankruptcy Nos. SV 96–16075
AG to SV 96–16079 AG.

United States Bankruptcy Court,
C.D. California.

May 11, 1998.

Scott H. McNutt, Rebecca U. Litteneker, Jeffrey C. Selman, Severson & Werson, San Francisco, CA, Richard M. Pachulski, James I. Stang, Debra Grassgreen, Pachulski, Stang, Ziehl & Young, P.C., Los Angeles, CA, for Sizzler.

John W. Mills, Feder & Mills, Los Angeles, CA, for Triple S Restaurants, Inc.

J. Baxter Schilling, Louisville, KY, Trustee, Triple S Restaurants, Inc.

## MEMORANDUM OF DECISION IN SUPPORT OF SUMMARY JUDGMENT

ARTHUR M. GREENWALD, Bankruptcy Judge.

### NATURE OF PROCEEDINGS

On June 2, 1996, Sizzler USA Restaurants, Inc., f/d/a/ Sizzler Restaurants International, Inc., ("Sizzler"), and four of its affiliates: Sizzler International, Inc. ("SII"), Collins Properties, Inc. ("CPI"), Tenly Enterprises, Inc. ("Tenly") and Buffalo Ranch Steakhous-es, Inc. ("Buffalo Ranch") (collectively, the "Debtors") filed voluntary petitions under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). Pursuant to Bankruptcy Code §§ 1107(a) and 1108, the Debtors operated their businesses and managed their property as debtors in possession. At the request of the Debtors, the Court entered an order authorizing the joint administration of the Debtors' bankruptcy cases.

As of January 1, 1996, the Debtors or their affiliated corporations operated, franchised or joint ventured approximately 600 restaurants in thirteen countries and in twenty-six states in the United States.

The Debtors each confirmed plans (the "Plans") within one year of the commencement of these cases. The Plans in the Tenly and Buffalo Ranch cases were confirmed at a hearing on February 24, 1997, and the Plans in the Sizzler, SII and CPI cases were confirmed at a hearing held on June 2, 1997.

Sizzler's Plan of Reorganization ("Plan"), provides, among other matters, that the rights afforded under the Plan are in complete satisfaction, discharge and release of all claims. The Plan also provides that confirmation discharges Sizzler from all general unsecured claims that arose before confirmation. In addition, this court's Order entered on August 14, 1997(1) Granting Emergency Motion for Order re proposed Modifications to Debtors' Plan of Reorganization, as Modified and (2) Confirming Debtors' Second Amended Plan of Reorganization, as Modified, also provides that "except as set forth [in the Order], all Creditor's be and they are hereby enjoined from the commencement or continuation of any action, the employment of process, or any act to collect, recover or offset any debts and/or Claims against Debtor and/or the Estate."

With respect to general unsecured claims, the Plan provides that holders of any such claim that is allowed will receive a beneficial interest in the Creditor Trust.[1] Pursuant to its terms, the Plan provides that each holder of an allowed general unsecured claim will

---

1. The Plan provides that general unsecured claims that consist of insured tort claims are subject to the alternative dispute process that the Court had put into place by order entered on April 7, 1997.

receive payments over four years in an amount equal to the allowed amount of his or her claim plus interest, less a pro rata allocation of certain expenses and subject to the reserve for disputed claims. Thus, it is anticipated that holders of allowed general unsecured claims will receive the allowed amounts of their claims in full, with interest.[2]

Given the substantial number of claims asserted against the Debtors' estates, the Court sought to implement a specific procedure to assure that claims resolution is handled in a productive manner and that all parties have a full and fair opportunity to present their position to the Court. Accordingly, following several status conferences addressing concerns about an appropriate claims resolution procedure, the Court entered an order instituting a detailed claims resolution procedure (the "Claims Procedure"). The Claims Procedure provided creditors with an extended notice period, prescribed specific guidelines for the manner and form of notice and created a system pursuant to which only contested claim objections would be scheduled for hearing. The Claims Procedure has allowed for an expeditious resolution of uncontested claim objections, providing creditors with ample opportunity to have contested issues heard by the Court. The claim objection at issue in the case at bar was filed and heard in accordance with the Claims Procedure.

On September 26, 1996, the Trustee in Bankruptcy for Triple S Restaurants, Inc. ("Triple S") filed a general unsecured claim against Sizzler in the amount of $5,000,000. On May 22, 1997, Sizzler filed an objection to Triple S' claim.

On September 15, 1997, Triple S filed a motion for relief from the automatic stay to allow it to prosecute a counterclaim against Sizzler. The counterclaim was filed in 1993 in the United States District Court for the Western District of Kentucky. The motion was heard on October 29, 1997. This court denied the motion by order of December 4, 1997 on the grounds that the Plan had discharged the Western District of Kentucky counterclaim.

2. The Plans of the other Debtors similarly pro-

On November 24, 1997, Sizzler filed a motion for summary judgment requesting that its objection to Triple S' claim be sustained and that Triple S' claim be disallowed in full. Triple S opposed this motion. The court heard the motion on January 13, 1998 and announced its ruling at that time.

The court, having considered the record before it, including the declarations and documents received in evidence, the various memoranda and briefs filed by the parties, and the statements and arguments of counsel, files this Memorandum of Decision, which, pursuant to Rule 7052(a), Fed. R.Bankr.P., and Rule 52(a), Fed.R.Civ.P., shall constitute this court's Statement of Uncontroverted Facts and Conclusions of law.

## STATEMENT OF UNCONTROVERTED FACTS

### Sizzler's Relationship With Triple S

Sizzler operated certain restaurants under the name "Sizzler" and also franchised others to operate Sizzler restaurants under license agreements. Triple S was a Sizzler franchisee, and operated restaurants in the greater Louisville, Kentucky, southern Indiana and southern Ohio areas pursuant to 17 license agreements. The first license agreements were entered into on April 22, 1988, and the last license agreement was entered into on February 19, 1992. The principals of Triple S were Michael Macatee and Robert Harrod. Both Macatee and Harrod were previously employed by Sizzler; Macatee was Sizzler's Vice President of Operations and Harrod was a Regional Manager.

Each of the license agreements only obligated Sizzler to provide a license of its trademarks and to perform the following additional duties:

6. COVENANTS AND AGREEMENTS OF LICENSOR

LICENSOR covenants and agrees:

A. To provide, at no charge to LICENSEE, training at an operating SIZZLER restaurant designated by LICENSOR and to permit LICENSEE, or his store man-

vide for full payment to creditors.

ager, to train at said SIZZLER restaurant in an on-the-job training and orientation program as determined by LICENSOR. No compensation will be paid by LICENSOR to any such trainee during said training period. All travel and living expenses incurred during said training period shall be borne by LICENSEE.

B. To provide LICENSEE with the use of books, manuals and other written materials relating to product specifications, advertising and promotion, operations and training, including additions and updates thereto as published by LICENSOR from time to time. LICENSOR reserves the right to periodically review these publications, collectively known as the Management Guide, and make additions and deletions as LICENSOR deems necessary.

C. To make available an in-store employee training film program for which there will be a monthly charge.

D. To make available to LICENSEE management programs, workshops and courses given to SIZZLER personnel for which there will be a charge.

E. To aid LICENSEE in construction of the RESTAURANT utilizing the unique design, decor, style and method of operation of the SIZZLER restaurants. LICENSOR agrees to provide a standard set of architectural plans, equipment and fixtures specifications, materials list, and equipment and fixtures suppliers list. LICENSEE is responsible for compliance with local building standards and zoning requirements and may adapt the plans and specifications to conform thereto upon prior written consent of LICENSOR.

F. To provide advice and assistance in the selection of the site and in the adaptation of the standard architectural plans to the site as LICENSOR, in its discretion, deems necessary for the successful operation of all Sizzler restaurants.

G. To provide assistance and advice in the promotion of the general business welfare of LICENSEE as LICENSOR deems necessary from time to time for the maintenance of the SIZZLER method of operation.

H. To keep LICENSEE informed of results of LICENSOR's research and development activities which may be conducted by LICENSOR including advertising, marketing studies and other information of interest to LICENSEE by means of bulletins, reports, newsletters, other publications and visits by LICENSOR's filed representatives, as LICENSOR deems appropriate.

The license agreements also provided that they were governed by California law and that their terms could "not be altered or amended except by a document in writing executed by LICENSOR and LICENSEE."

Nowhere in the license agreements is there an express obligation that Sizzler spend money advertising the Sizzler name in any of the marketing areas where Triple S operates. The only party expressly obligated under the license agreements to spend money advertising in the area where Triple S operated was Triple S. Sizzler had no express contractual obligation to use the buffet court and grill marketing concept, or any other specific marketing concept. Sizzler also owed no express contractual duty to Triple S as to how it would train other franchisees in the handling of food.

### The Western District Of Kentucky Litigation And Triple S' Claim

In 1993, Sizzler terminated Triple S' license agreements and filed an action against it in the United States District Court for the Western District of Kentucky, Case Number 93–CV–679–S. Sizzler alleged that Triple S breached its contractual obligations by failing to pay amounts owed under the license agreements, real property leases and promissory notes, and by continuing to operate the restaurants after termination of the applicable license agreements.

Triple S answered and filed a counterclaim against Sizzler. In its counterclaim, Triple S alleged the following breaches of the license agreements:

1. Sizzler "never provided any management assistance or help from the time [Triple S] became a franchisee until the present and [Sizzler] never spent any money advertising the Sizzler name in any of

the marketing areas where [Triple S] operates."

2. Sizzler abandoned the buffet court and grill concept that was introduced in 1989.

3. Sizzler's alleged negligence "in not instructing franchisees in safe food handling procedures and/or its negligence in not enforcing safe food handling procedures caused" E. Coli poisonings at other franchisees' restaurants which alleged "decimated [Triple S'] business" in breach of the franchise agreements.

Triple S' counterclaim also asserted that Sizzler breached its fiduciary obligations with Triple S, and claimed that Sizzler was liable for negligence.

On September 29, 1994, the Western District of Kentucky District Court granted all of Sizzler's requested relief by entering a Preliminary Injunction enjoining Triple S from (1) using Sizzler's trademarks and service marks and (2) doing business in any manner that might tend to give the general public the impression that the Triple S restaurants were Sizzler restaurants. On September 30, 1994, Triple S filed a Chapter 11 bankruptcy petition. In November 1994, the Bankruptcy Court for the Western District of Kentucky ordered Triple S to turn over to Sizzler the restaurants that Triple S was operating. In December 1994, the Bankruptcy Court converted Triple S' bankruptcy case to Chapter 7.

Since Sizzler commenced its bankruptcy case on June 2, 1996, the action pending in the Western District of Kentucky has been abated. In its December 4, 1997 order denying Triple S' motion for relief from the automatic stay, this court determined that Sizzler's Plan of Reorganization discharged Triple S' counterclaim in the Western District of Kentucky.

*Sizzler's Buffet Court And Grill Marketing Concept*

The buffet court and grill marketing concept, which was developed by Macatee and Harrod while they were employed by Sizzler, was used by Sizzler in the late 1980's and early 1990's. The buffet court part of the marketing concept proved to be a poor revenue-generating vehicle, even though it pro-duced the bulk of sales at Sizzler restaurants. On the other hand, the grill side of the marketing concept was a better revenue generator than the buffet court, but did not result in as much sales. As a result, Sizzler decided that it would undertake a reorientation of its marketing emphasis from the buffet court to the grill. In doing so, however, Sizzler never evoked the marketing concept or issued a directive to franchisees that the franchisees could not use the buffet court and grill marketing concept. Sizzler never changed to another marketing concept.

Sizzler's decisions concerning the reorientation of the marketing concept had the support of the marketing committee of the board of trustees of the Sizzler franchisee organization, the National Sizzler Franchisee Association ("NSFA"). In its August 1, 1991 Marketing Committee Report, the NSFA stated as follows:

> The committee supports the Sizzler position that Buffet Court is not the long term answer to sales and profitability for the Sizzler system. Higher food costs, much lower average checks, and an extremely high share of our guests ordering Buffet Court as a meal requires a change in Sizzler position.

The reasons for this support were threefold. First, though customers were attracted to the buffet court, it was difficult to generate revenues from the buffet court. The grill was a better revenue-generating vehicle. Therefore, it was desirous to shift customers away from the buffet court and to the grill. Second, some Sizzler operators were having difficulty maintaining the quality of some of the items offered in the buffet court. Third, market studies showed that the buffet court led to a diminished customer value perception of Sizzler because customers thought that the quality of Sizzler restaurants was dropping as Sizzler began to move towards a more buffet-oriented marketing concept.

*Sizzler's Handling Of The Purported E–Coli Outbreaks At Sizzler Franchises In The Pacific Northwest*

In 1993, there were reports of E–Coli incidents at several Sizzler franchise restaurants in Oregon and Washington. As part of its

response to these purported outbreaks, Sizzler set aside a $4.9 million reserve to cover the costs and contingencies of recovery and marketing assistance to franchisees. Sizzler also circulated memos to its franchisees concerning the proper handling of food.

## DECISION

(1) There is no genuine issue as to any material fact indicating that Sizzler is in breach of express provisions of Triple S' license agreements. Sizzler is entitled to judgment as a matter of law on this claim.

(2) There is no genuine issue as to any material fact indicating that Sizzler is in breach of the implied covenant of good faith and fair dealing. Sizzler is entitled to judgment as a matter of law on this claim.

(3) Summary judgment in favor of Sizzler and against Triple S shall be entered, decreeing that Sizzler's objections to Claim No. 1980 are sustained and that Triple S' claim is disallowed in full, Triple S to take nothing by its claim.

## DISCUSSION

### *Burden Of Proof On Summary Judgment*

Rules 7056 and 9014, Fed.R.Bankr.P., incorporate Rule 56, Fed.R.Civ.P., as being applicable to contested matters. Sizzler's objection to the claim of Triple S is a contested matter. Rule 56(b), Fed.R.Civ.P., provides that "a party against whom a claim . . . is asserted . . . may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof." The court should grant the motion for summary judgment if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P.

■ Sizzler, as the moving party, bears the initial burden of demonstrating a lack of any genuine issue of material fact as to Triple S' claim. Rule 56(c), Fed.R.Civ.P.; *British Airways Board v. Boeing Co.*, 585 F.2d 946, 951 (9th cir.1978). Sizzler must demonstrate the absence of any real issue of material fact as to one or more elements essential to support the claim of Triple S. *See T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987); and *Richards v. Neilsen Freight Lines*, 810 F.2d 898, 902 (9th cir.1987); *see also Wilson v. City of Zanesville*, 954 F.2d 349, 351 (6th Cir.1992).

■ In meeting its burden regarding this motion for summary judgment, Sizzler is not required to negate or disprove matters that Triple S will have the burden of proving at trial. Sizzler need not produce any evidence on these matters. Sizzler's burden is met by pointing out to the Court that there is an absence of evidence to support Triple S' claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct., 2548, 2554, 91 L.Ed.2d 265 (1986). To do so, "[i]t is enough for the movant to bring up the fact that the record does not contain such an issue and to identify that part of the record which bears out his assertion." *Mt. Pleasant v. Associated Elec. Co-op.*, 838 F.2d 268, 273 (8th Cir.1988).

■ Triple S, having the ultimate burden of proof at trial, is required to come forward with evidence consisting of " 'specific facts showing that there is a genuine issue for trial.' " *Celotex Corp., supra*, 477 U.S. at 324, 106 S.Ct. at 2553. "Put another way, summary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable jury could return a verdict in its favor, [Citation omitted.] the mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient. [Citation omitted.]" *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir.1995). To meet this burden, the Ninth Circuit requires that the nonmoving party "produce at least some significant probative evidence tending to support the complaint." *Id.*, at 1222 (quotation marks omitted).

### *Triple S' Contract Claim*

■ Triple S claims that Sizzler breached the license agreements. In its opposition to Sizzler's motion for summary judgment,

Triple S claims that Sizzler breached the license agreements in the following ways:[3]

1. Triple S claims that Sizzler breached the license agreements by failing to provide management assistance to Triple S.

2. Triple S claims that Sizzler breached the license agreements by failing to provide promised advertising support to Triple S.

3. Triple S claims that Sizzler breached the license agreements by abandoning its support of a buffet court and grill marketing concept.

4. Triple S claims that Sizzler breached the license agreements by being grossly negligent in its handling of purported E–Coli outbreaks at Sizzler franchise restaurants in the Pacific Northwest.[4]

5. Triple S claims that Sizzler breached the license agreements by being negligent in approving sites selected by Triple S.

These five contractual claims involve either a breach of an express covenant of the license agreements, a breach of the implied covenant of good faith and fair dealing, or both.

### Breach Of The Implied Covenant Of Good Faith And Fair Dealing Requires Evidence That Sizzler's Decision–Making Process Was Dishonest Or Outside Of Accepted Commercial Practices

■ At the root of each of Triple S' five contractual claims is the contention that the implied covenant of good faith and fair dealing requires Sizzler, as a franchisor, to insure any franchisee against failure who follows the Sizzler method. This assertion is unacceptable because the implied covenant of good faith and fair dealing cannot override an express contractual provision. *Carma Developers (Cal.) Inc. v. Marathon Development California, Inc.*, 2 Cal.4th 342, 374, 826 P.2d 710, 728, 6 Cal.Rptr.2d 467, 485 (1992). The license agreements provide that Sizzler has not guaranteed the success of the franchise, and that the success of the franchise involves substantial risks and depends on Triple S' abilities. The court declines to apply the implied covenant of good faith and fair dealing to nullify these express provisions.

Another attempt by Triple S to apply the implied covenant of good faith and fair dealing is Triple S' assertion that Sizzler has breached various provisions of the license agreements which vest discretion in Sizzler with respect to its performance of these provisions.

■ The "implied covenant of good faith and fair dealing requires that 'a party vested with contractual discretion must exercise that discretion reasonably and with proper motive, and may not do so arbitrarily, capriciously, or in a manner inconsistent with the

3. In its counterclaim from the Western District of Kentucky, upon which Triple S states it bases its claim against Sizzler, Triple S also asserted in its first cause of action that there was a fiduciary relationship between Sizzler and Triple S that Sizzler breached, and in doing so, Sizzler breached the license agreements. However, as a matter of California law, a franchisor does not owe a franchisee any fiduciary duties. *See e.g., Martin v. U–Haul Co. of Fresno*, 204 Cal.App.3d 396, 412–14, 251 Cal.Rptr. 17, 25–27 (1988) (no "special relationship" characterized by elements of a fiduciary relationship in ordinary commercial contracts such as a supplier-distributor relationship); *Eichman v. Fotomat Corp.*, 880 F.2d 149, 169 (9th Cir.1989) (special relationship does not exist in franchisor-franchisee relationship); *Walker v. KFC Corp.*, 728 F.2d 1215, 1220, n. 5 (9th cir.1984) ("[t]here is no indication in the Franchise Investment Law that the Legislature intended, however, to impose a fiduciary duty on franchisors"). The laws of Kentucky, Indiana, and Ohio are in accord. *See St. Martin v. KFC Corp.* 935 F.Supp. 898, 908 (W.D.Ky.1996) ("Generally, franchise agreements do not impose fiduciary duties."); and *KFC Corporation v. Goldey*, 129 F.R.D. 157, 158 (W.D.Ky.1990); *Vaughn v. General Foods Corporation, supra*, 797 F.2d at 1414 (no evidence of fiduciary relationship between franchisor and franchisee); *Saydell v. Geppetto's Pizza & Ribs Franchise Sys., Inc.*, 100 Ohio App.3d 111, 130–131, 652 N.E.2d 218, 231 (1994) (no fiduciary relationship between franchisor and franchisee). Therefore, no fiduciary relationship can exist that Sizzler breached. Furthermore, because Sizzler cannot have breached any fiduciary duties, it also cannot have breached the license agreements as a result.

4. Although Triple S' proof of claim states both the fourth and fifth contractual claims as being for Sizzler's negligence rather than for Sizzler's breach of contact arising from its alleged negligence, in response to Sizzler's argument in the motion for summary judgment that no negligence claim can exist, Triple S states that it only is asserting a breach of contract claim against Sizzler, and not a negligence claim. Therefore, Sizzler's motion for summary judgment on the negligence claim is moot.

reasonable expectations of the parties.'" *Burger King v. Agad,* 941 F.Supp. 1217, 1221 (N.D.Ga.1996).

Triple S does not disagree with this standard. For example, the *Dunfee* case, relied upon by Triple S in support of its position of what it must prove to establish that Sizzler breached the implied covenant, held that "the jury had to focus upon [the franchisor's] conduct in performing the contract rather than breaching the contract. Under the franchise agreement, [the franchisor] had the exclusive right to determine site location and the inquiry necessarily evaluated the reasonableness of the [franchisor's] conduct in light of the reasonable expectations of the parties to the franchise agreement." *Dunfee v. Baskin–Robbins, Inc.,* 221 Mont. 447, 720 P.2d 1148, 1153 (Mont.1986). What constitutes the reasonable expectations of the parties under *Dunfee* was subsequently explained as follows:

> Each party to a contract has a justified expectation that the other will act in a reasonable manner in its performance or efficient breach. When one party uses discretion conferred by the contract to act dishonestly or to act outside of accepted commercial practices to deprive the other party of the benefit of the contract, the contract is breached.

*Story v. City of Bozeman,* 242 Mont. 436, 791 P.2d 767, 775 (Mont.1990). Therefore, to defeat Sizzler's motion, Triple S must offer evidence that Sizzler, to the extent that it made discretionary decisions pursuant to the license agreements, acted dishonestly or outside of accepted commercial practices, or with an improper motive or in an unreasonable manner that was arbitrary, capricious, or inconsistent with the reasonable expectations of the parties.

■ The inquiry into Sizzler's decision-making process is not an inquiry that looks to results, but more appropriately should examine the actual decision-making process to determine whether it was legitimate, i.e., honest or within accepted commercial practices. This court declines to second-guess the result reached, as long as the decision-making process was honest or was within accepted commercial practices. *See Svela v.*

*Union Oil Co. of California,* 807 F.2d 1494, 1501 (9th Cir.1987) (court cannot second-guess franchisor's economic decisions if made in good faith); *Agad, supra,* 941 F.Supp. at 1222 (implied covenant of good faith and fair dealing cannot be used to second-guess franchisor's legitimate business decisions); and *Vasco v. Mobil Oil Corp.,* 698 F.Supp. 102, 104 (D.Md.1988) ("'Good faith' has been uniformly interpreted as meaning subjective good faith, that is, an honest evaluation of the franchisor's economic decisions."). Even if these decisions have a detrimental effect on the franchisees' businesses, a court should not second-guess the franchisor's good faith business decisions. *See e.g. Clark v. America's Favorite Chicken Co.,* 110 F.3d 295, 297–99 (5th Cir.1997) (no breach of the implied covenant of good faith and fair dealing despite fact that franchisor's national marketing strategy and concept made individual franchisee less competitive and resulted in loss of business); *see also Vaughn v. General Foods Corp.,* 797 F.2d 1403, 1413 (7th Cir. 1986) (no protection against dissatisfaction of franchisee with the degree of success it achieved as a result of franchisor's attempts to create a viable franchise system).

Triple S erroneously asserts that this court can consider the result without having to consider evidence concerning whether Sizzler had legitimate reasons for making its decisions, or acted dishonestly or outside of accepted commercial practices. In *Dunfee, supra,* 720 P.2d at 1153–54, that court points out that a court must examine the decision-making process, and not the result of that process. Numerous other decisions have criticized the approach urged by Triple S. In *Dunafon v. Taco Bell Corp.,* CCH Business Franchise Guide ¶ 10,919 (W.D.Mo. 1996), the court held that "[t]o succeed on a claim for a breach of the implied covenant of good faith and fair dealing, plaintiffs must show that the defendant acted with *bad faith or an evil motive." Id.,* at p. 28,146 (emphasis added). Similarly, the District Court from the Northern District of Illinois in a recent case has pointed out as follows:

> Problems involving the duty of good faith "generally arise where one party to a contract is given broad discretion in per-

formance." [Citations omitted.] The duty of good faith between contracting parties "requires that a party vested with contractual discretion must exercise his discretion reasonably and may not do so arbitrarily or capriciously." [Citations omitted.] *Thus, "[w]here contractual discretion is exercised in bad faith, the contract is breached and it is incumbent on the courts to grant appropriate relief; however, bad faith is not synonymous with erroneous judgment."* [Citation omitted.] When such discretion is abused by a party in bad faith, then, a cause of action may arise derivatively from the duty of good faith and fair dealing. [Citation omitted.] *Oil Express National, Inc. v. Burgstone, et al.,* 958 F.Supp. 366, 369 (N.D.Ill.1997) (emphasis added). *See also Bonfield v. AAMCO Transmissions, Inc.,* 708 F.Supp. 867, 884–85 (N.D.Ill.1989).

▮▮▮ Equally as important, good cause or a legitimate business reason for a discretionary decision defeats a claim of breach.

As a general proposition of law, it is widely held that where good cause exists, motive is immaterial to a determination of good faith performance. Corbin on Contracts states:

"The most widely recognized privilege to act regardless of motive is furnished by the existence of good cause. There are myriads of cases recognizing that good cause to take a particular ·action will constitute a defense to a finding that the actor is in bad faith. [Citation omitted.]

and also

"Where there is good cause, there is no bad faith." [Citation omitted.]

*Dayan v. McDonald's Corporation,* 125 Ill. App.3d 972, 81 Ill.Dec. 156, 172, 466 N.E.2d 958, 974 (Ill.App.1984). As long as it is undisputed that Sizzler had good cause or a legitimate business reason for the discretionary decisions it made, there does not exist a breach of the implied covenant of good faith and fair dealing.[5]

### No Evidence Exists To Support Triple S' Breach Of Contract Claims

#### 1. The Provision Of Management Assistance

▮▮▮ Section 6 of the license agreements required Sizzler to provide management assistance to Triple S as Sizzler, in its discretion, deems necessary. Because Section 6 vested discretion in Sizzler to determine what assistance to provide, the only requisite regarding Sizzler's performance was that it had to exercise its discretion in good faith. *See e.g., Burger King, supra,* 941 F.Supp. at 1221.

Triple S offers no evidence that Sizzler failed to provide management assistance to Triple S. However, Triple S does offer evidence concerning the management assistance purportedly provided by Sizzler to other franchisees. This evidence, however, is not relevant to whether Sizzler breached its obligations to provide management assistance to Triple S. Therefore, Triple S has failed to establish that there exists a triable issue of fact as to whether Sizzler provided it with management assistance.

▮▮▮ Triple S also offers no evidence establishing that, in deciding what management

5. Evidence, for example, that a decision had a system-wide impact, including an impact on the franchisor is sufficient evidence that the decision was made in good faith. *See e.g., American Mart Corp. v. Joseph E. Seagram & Sons,* 824 F.2d 733, 734–735 (9th Cir.1987) (affirmance of judgment in favor of defendant franchisor on breach of contract claim for termination of distributor resulting from nationwide plan of reorganization because evidence was that "nationwide plan (1) was warranted by compelling business considerations and (2) constituted a valid business judgment."); *Clark v. American's Favorite Chicken Co., supra,* 110 F.3d at 298–299 (affirmance of summary judgment in favor of defendant franchisor because no evidence that plaintiff impacted

any differently than the rest of franchise system by national marketing strategy); *Schott Motorcycle Supply v. Am. Honda Motor co.,* 976 F.2d 58, 63 (1st Cir.1992) (affirmance of summary judgment in favor of defendant franchisor on breach of contract claim that defendant's withdrawal from product market was in bad faith because only evidence was of legitimate business reason for decision); and *Three D Departments, Inc. v. K Mart Corp.,* 670 F.Supp. 1404, 1408 (N.D.Ill. 1987) (motion to dismiss claim that defendant franchisor breached contract by closing plaintiff franchisee's store when it closed entire chain of stores granted as franchisor legitimately exercised discretion to close entire chain of stores).

assistance to provide to Triple S, Sizzler acted dishonestly or outside accepted commercial practices, or that it did so with improper motives, or arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties. Triple S has failed to establish that there exists a triable issue of fact as to whether Sizzler acted in breach of the implied covenant of good faith and fair dealing in providing management assistance to Triple S. As a result, Sizzler is entitled to judgment as a matter of law on the claim that it breached the express provisions of the license agreements and the implied covenant of good faith and fair dealing with regard to the provision of management assistance to Triple S.

### 2. The Provision Of Advertising Support

■ It is undisputed that the license agreements did not expressly obligate Sizzler to provide advertising support. However, Triple S asserts that there existed a subsequent oral agreement that modified the written license agreements. However, the license agreements require that any modifications be in writing. Furthermore, under applicable California law, an oral modification of the license agreements can only occur if there is a showing of either new consideration or a modification fully executed by both parties. California Civil Code § 1698; *see also Marani v. Jackson,* 183 Cal.App.3d 695, 704–06, 228 Cal.Rptr. 518, 523–24 (1986); *Beggerly v. Gbur,* 112 Cal.App.3d 180, 188–190, 169 Cal.Rptr. 166, 171–72 (1980); and *Coldwell Banker & Co. v. Pepper Tree Office Center Associates,* 106 Cal.App.3d 272, 280–81, 165 Cal.Rptr. 51, 56 (1980). Triple S has offered no evidence of either new consideration or fully executed performance, nor has Triple S established that there exists a triable issue of fact concerning Triple S' contention. Absent evidence of any new consideration or fully executed performance, the purported subsequent oral modification is unenforceable. *See Karlsen v. American Sav. & Loan Assn.,* 15 Cal.App.3d 112, 121, 92 Cal.Rptr. 851, 856 (1971); *National Dollar Stores v. Wagnon,* 97 Cal.App.2d 915, 920–21, 219 P.2d 49, 53 (1950); *Rottman v. Hevener,* 54

Cal.App. 474, 480–481, 202 P. 329, 331–32 (1921); *Scheeline v. Moshier,* 172 Cal. 565, 158 P. 222 (1916); *Stroud v. Thomas,* 139 Cal. 274, 72 P. 1008 (1903).

Furthermore, because there is no express provision in the license agreements that Sizzler provide advertising support, or evidence of any enforceable subsequent oral modification of the license agreements to that effect, no triable issue of fact exists as to whether Sizzler breached any alleged express promise or subsequent oral modification.

■ In addition, to the extent that creation of the duty sought by Triple S requires the court to rely upon the implied covenant of good faith, the court declines to do so because the implied covenant cannot override an express contractual provision. The license agreements have expressly stated all of Sizzler's duties. *Carma Developers (Cal.), Inc., supra,* 2 Cal.4th at 374, 826 P.2d at 728, 6 Cal.Rptr.2d at 485. In addition, the implied covenant will not apply where no express term exists on which to hinge an implied duty, and where there has been compliance with the contract's express terms. *See e.g., McMillin Scripps North Partnership v. Royal Ins. Co.,* 19 Cal. App.4th 1215, 1222, 23 Cal.Rptr.2d 243, 247 (1993) (no bad faith where no coverage under insurance policy). The implied covenant may be breached only when the franchisor deprives the franchisee of its primary right to express contractual benefits owed the franchisee. "Absent that primary right, however, the *auxiliary* implied covenant has nothing upon which to act as a supplement, and should not be endowed with an existence independent of its contractual underpinnings." *Love v. Fire Ins. Exch.,* 221 Cal. App.3d 1136, 1153, 271 Cal.Rptr. 246, 256 (1990) (original emphasis).

Because Triple S had no express contractual right to advertising support, the implied covenant of good faith cannot create this type of right. As a result, Sizzler is entitled to judgment as a matter of law on the claims that it breached the express provisions of the license agreements and the implied covenant of good faith and fair dealing with regard to the provision of advertising support.

### 3. The Decisions Concerning The Buffet Court And Grill Marketing Concept

██ There was nothing expressly stated in the license agreements requiring Sizzler to use the buffet court and grill marketing concept. Therefore, Sizzler's decision to reorient the emphasis from the buffet court to the grill in the future development of its marketing plans is limited to the issue of whether Sizzler breached the implied covenant of good faith and fair dealing in exercising its discretion under Section 6 of the license agreements in undertaking this reorientation.

Sizzler has offered evidence uncontroverted by Triple S that it had good cause for deciding to undertake this reorientation. Furthermore, Triple S has failed to establish that Sizzler acted dishonestly or outside accepted commercial practices, or did so with improper motives, or arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties. Triple S has failed to establish that there exists a triable issue of fact as to whether Sizzler acted in breach of the implied covenant of good faith and fair dealing in deciding to reorient the emphasis from the buffet court to the grill. Therefore, Sizzler is entitled to judgment as a matter of law on the claim that it breached the implied covenant of good faith and fair dealing with regard to its decisions concerning the buffet court and grill marketing concept.

### 4. The Handling Of The Response To The Purported E–Coli Outbreaks

██ Triple S' claim with regard to Sizzler's handling of its response to the purported E–Coli outbreaks also does not establish that Sizzler breached an express covenant of the license agreements. Rather, the issue is whether Sizzler breached the implied covenant of good faith and fair dealing in exercising its discretion under Section 6 of the license agreements in handling its response to this problem. The court finds that Triple S has not offered evidence that would show that in deciding the nature of the response and implementing that response, Sizzler acted dishonestly or outside accepted commercial practices, or did so with improper motives, or arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties. Therefore, Triple S has failed to establish that there exists a triable issue of fact as to whether Sizzler acted in breach of the implied covenant of good faith and fair dealing in handling its response to the purported E–Coli outbreaks. Sizzler is entitled to judgment as a matter of law on the claim that it breached the implied covenant of good faith and fair dealing with regard to this issue.

### 5. The Approval Of Sites Selected By Triple S

The final contractual claim asserted by Triple S is that Sizzler breached the express provisions contained in Section 6 of the license agreements regarding the providing of advice and assistance in the selection of sites for Triple S's restaurants. There is no dispute that Sizzler provided the advice and assistance required by Section 6 of the license agreements in approving the sites selected by Triple S. In carrying out the provisions of Section 6, Sizzler had discretion to determine what advice and assistance should be provided and whether a site should be approved. The issue to be considered is whether Sizzler's discretionary action in approving the sites selected by Triple S was exercised in compliance with the implied covenant of good faith and fair dealing.

██ Triple S does not offer any evidence that Sizzler acted dishonestly or outside accepted commercial practices, or with improper motives, or arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties, in approving the sites selected by Triple S. Rather, Triple S asks the court to continue the motion as to this claim pursuant to Rule 56(f), Fed.R.Civ. P., to enable it to conduct discovery on this issue.

██ Rule 56(f), Fed.R.Civ.P., only allows for a continuance if a particularized showing of the need for one is made. Specifically, Triple S "bears the burden of showing 'what facts [it] hopes to discover to raise a material issue of fact.'" *Terrell v. Brewer,* 935 F.2d 1015, 1018 (9th Cir.1991). "The party seeking additional discovery also bears the burden of showing that the evidence sought exists." *Id.*

Triple S has not established what specific discovery it contemplates or what its expectations are as to what that discovery would show. Nor does it have any facts or information which it would use to demonstrate that the discovery it would likely obtain would assist it in establishing that there exists a triable issue of fact. This court finds that Triple S has failed to make a sufficient showing for this court to continue this motion to allow Triple S, pursuant to Rule 56(f), Fed. R.Civ.P., to engage in additional discovery.

Due to the absence of evidence offered by Triple S in support of this claim, Triple S has failed to establish that there exists a triable issue of fact as to whether Sizzler acted in breach of the implied covenant of good faith and fair dealing in approving sites selected by Triple S. As a result, Sizzler is entitled to judgment as a matter of law on the claim that it breached both the express provisions of the license agreements and implied covenant of good faith and fair dealing.

### CONCLUSION

Sizzler is entitled to summary judgment decreeing that Sizzler's objection to Claim 1980 is sustained and that Claim No.1980 is disallowed in its entirety, Triple S to take nothing by this claim.